UNITED STATES ᴇᴛ ᴀʟ. *v.* ROCK ISLAND MOTOR
TRANSIT CO. ᴇᴛ ᴀʟ.

No. 25. Argued November 7, 1950.—Decided February 26, 1951.

420

*Daniel W. Knowlton* argued the cause for the United States and the Interstate Commerce Commission, appellants. With him on the brief were *Solicitor General Perlman, Acting Assistant Attorney General Underhill* and *Edward M. Reidy.* *Allen Crenshaw* was also of counsel for the Interstate Commerce Commission.

*Harry E. Boe* argued the cause for the Rock Island Motor Transit Company, appellee. With him on the brief were *Martin L. Cassell, W. F. Peter* and *A. B. Enoch.*

*Ernest Porter* and *Bert F. Wisdom* submitted on brief for the Iowa State Commerce Commission, appellee. *George Cosson, Jr.* was also of counsel.

*Einar Viren* submitted on brief for the Omaha Chamber of Commerce, appellee.

MR. JUSTICE REED delivered the opinion of the Court.

Questions of the power of the Interstate Commerce Commission to tighten the restrictions on operations of a railroad's motor-carrier affiliate are raised by this appeal. In the Commission's view the operations must be modified in order to make them truly auxiliary to or supplemental of the rail service. They are conducted (1) under a certificate of convenience and necessity issued in 1941 under § 207 of the Interstate Commerce Act, and (2) under an order of 1944 approving the acquisition of another motor carrier. The certificate contains the condition that the Commission might impose other terms to restrict the holder's operation to service which is auxiliary to or supplemental of rail service. The order contains neither this condition nor any other relating to the specific operating rights of the carrier.

The issues involve a basic power of the Commission to regulate the operations of motor carriers affiliated with railroads so as to assure that at all times the motor operations shall be consonant with the National Transportation Policy, 54 Stat. 899. The Commission has decided that that policy requires the motor operations of railroads and their affiliates to be auxiliary to and supplemental of train service. This raises questions as to how the planned

auxiliary and supplemental service is to be -achieved. Differences also exist as to what phases of motor-carrier operations are auxiliary to and supplemental of rail or train service.

The Rock Island Motor Transit Company, a wholly-owned corporate subsidiary of the Chicago, Rock Island and Pacific Railroad Company and its predecessors, is a common carrier by motor vehicle engaged in transporting property in inter- and intrastate commerce, exclusively, for all practical purposes, along the rail lines of its parent corporation in Arkansas, Illinois, Indiana, Iowa, Minnesota, Missouri, Nebraska, Tennessee, Texas and Kansas. Many of Transit's operations alongside its parent are in different localities and under other I. C. C. authorities than the certificate and order here involved.

This appeal deals with additional operating restrictions placed subsequent to the Commission's formal approval of Transit's purchase and operation, upon two of Transit's acquisitions. The first is a segment of the so-called White Line Purchase. The Line was in process of perfecting its "grandfather rights" under § 206 (a), Motor Carrier Act, at the time of appellees' agreement to purchase. The order directing issue of the certificate to Rock Island recognized this. This purchase was authorized under § 213, Motor Carrier Act of 1935, 49 Stat. 555, April 1, 1938, Docket No. MC–F–445; reported 5 M. C. C. 451, 15 M. C. C. 763. The segments of the White Line Purchase here involved are those between Des Moines, Iowa, and Omaha, Nebraska, and Des Moines, Iowa, and Silvis, Illinois, included in Transit's certificate of convenience and necessity issued in No. MC 29130, December 3, 1941. That certificate had only the following provisions in any way applicable to this controversy:

> "Service is authorized to and from the intermediate points on the above-specified routes which are

also stations on the lines of The Chicago, Rock Island and Pacific Railway Company.

. . . . .

"The operations authorized on the above-specified routes are subject to such further limitations, restrictions, or modifications as we may find it necessary to impose or make in order to insure that the service shall be auxiliary or supplementary to the train service of The Chicago, Rock Island and Pacific Railway Company and shall not unduly restrain competition."

The second acquisition is the so-called Frederickson Purchase, authorized November 28, 1944, Docket No. MC–F–2327, under § 5, Interstate Commerce Act, 54 Stat. 905, by which Transit acquired, from the holders of a certificate of convenience and necessity, a route between Atlantic, Iowa, and Omaha, Nebraska. Neither the report nor the order contained provisions alike or akin to these just quoted from the White Line certificate. No order for a certificate has yet been entered and no certificate has been issued.

The routes here involved are a major part of the Rock Island's truck route between Chicago and Omaha. The eastern end of that route from Silvis, Illinois, to Chicago is operated under other I. C. C. authority.

Transit has been operating the above routes since their respective dates. Under those authorities, Transit states it has engaged in trucking service as follows:

"(a) a coordinated rail-service, at rail rates auxiliary to the existing service of appellee's affiliated railroad; (b) a motor service in substitution of rail service, at rail rates; and (c) a motor common carrier service at rates and tariffs observed and applied by appellee's predecessors, as modified from time to time."

On February 5, 1945, the Commission directed reopening of the dockets to give reconsideration to the above certificate and order,

"solely to determine (a) the conditions or restrictions, if any appear necessary, which should be imposed to insure that the motor carrier service performed by The Rock Island Motor Transit Company is limited to that which is auxiliary to, or supplemental of, rail service, and (b) the condition, if any appears necessary, which should be imposed so as to make the authority granted to The Rock Island Motor Transit Company subject to such further conditions or restrictions as the Commission may find necessary to impose in order to insure that the service shall be auxiliary to, or supplemental of, rail service."

At the end of that reconsideration, an order was entered to modify the White Purchase certificate and the Frederickson order in the following respects:

"1. The service to be performed by The Rock Island Motor Transit Company shall be limited to service which is auxiliary to, or supplemental of, train service of The Chicago, Rock Island and Pacific Railroad Company, hereinafter called the Railroad.

"2. The Rock Island Motor Transit Company shall not render any service to or from any point not a station on a rail line of the Railroad.

"3. No shipments shall be transported by The Rock Island Motor Transit Company between any of the following points, or through, or to, or from, more than one of said points: Omaha, Nebr., Des Moines, Iowa, and collectively Davenport and Bettendorf, Iowa, and Rock Island, Moline, and East Moline, Ill.

"4. All contractual arrangements between The Rock Island Motor Transit Company and the Railroad shall be reported to us and shall be subject to

revision, if and as we find it to be necessary, in order that such arrangements shall be fair and equitable to the parties.

"5. Such further specific conditions as we, in the future, find it necessary to impose in order to insure that the service shall be auxiliary to, or supplemental of, train service." *Rock Island Motor Transit Co.*, 55 M. C. C. 567, 597–598, affirming 40 M. C. C. 457.

It is from those modifications that Transit sought relief through §§ 1336 and 2325 of 28 U. S. C. from a three-judge district court. The relief was granted and the orders were annulled and their enforcement enjoined. 90 F. Supp. 516. The United States and the Interstate Commerce Commission appealed under 28 U. S. C. § 1253. We noted probable jurisdiction.

Transit's objection to the order modifying the provisions under which it operates these routes may be generalized as a contention that the Commission's order changes or revokes a part of Transit's operating authority, previously granted by the Commission, without any failure by Transit to comply with any term, condition or limitation of the Commission authority under which Transit functions. Changes or revocations may only be made under § 212 (a) of the Interstate Commerce Act, for such failures.[1]

The Commission, on the other hand, takes the position that there is no change in or revocation of its authoriza-

---

[1] SEC. 212 (a), 49 Stat. 555, 52 Stat. 1238, 54 Stat. 924:

"Certificates, permits, and licenses shall be effective from the date specified therein, and shall remain in effect until suspended or terminated as herein provided. Any such certificate, permit, or license may, upon application of the holder thereof, in the discretion of the Commission, be amended or revoked, in whole or in part, or may upon complaint, or on the Commission's own initiative, after notice and hearing, be suspended, changed, or revoked, in whole

tion to operate as a motor common carrier. It looks upon the certificate for the White Line route and the order for the Frederickson Purchase as being controlled by the Interstate Commerce Act and Transit's applications for purchase approval. The Commission understands the Declaration of Policy, § 202 (a) of the Motor Carrier Act, enacted at the inception of federal regulation of motor carriers in 1935, 49 Stat. 543, as directing it to preserve the inherent advantages of such transportation in the public interest. It finds support for this view in the National Transportation Policy set out in the 1940 amendments to the Interstate Commerce Act, 54 Stat. 899, declaring that the Act should be administered so as to recognize and preserve the inherent advantages of rail, motor and water transportation.[2] It treats § 213 of the Motor Carrier Act of 1935 and present § 5 of the Interstate Commerce Act as authorizing mergers, consolidations and acquisitions between rail and motor carriers

---

or in part, for willful failure to comply with any provision of this part, or with any lawful order, rule, or regulation of the Commission promulgated thereunder, or with any term, condition, or limitation of such certificate, permit, or license: . . . ."

[2] 40 M. C. C. 457, 473:

"It is our opinion, originally indicated in the *Kansas City Southern* case and confirmed by nearly a decade of experience in motor-carrier regulations, that the preservation of the inherent advantages of motor-carrier service and of healthy competition between railroads and motor carriers and the promotion of economical and efficient transportation service by all modes of transportation and of sound conditions in the transportation and among the several carriers, in short the accomplishment of the purposes forming the national transportation policy, require that, except where unusual circumstances prevail, every grant to a railroad or to a railroad affiliate of authority to operate as a common carrier by motor vehicle or to acquire such authority by purchase or otherwise should be so conditioned as definitely to limit the future service by motor vehicle to that which is auxiliary to, or supplemental of, train service."

only within the Transportation Policy.[3]   Although § 207, providing for the issuance of certificates of convenience and necessity, has no clause requiring special justification for railroads to receive motor-carrier operating rights, such as appears in the proviso in former § 213 and present § 5, the Commission applies the rules of the National Transportation Policy so as to read the proviso into § 207 in order to preserve the inherent advantages of motor-carrier service.[4]

The trial court accepted Transit's argument.   90 F. Supp. at 519.   The court found the undisputed fact to be

---

[3] § 213 (a), 49 Stat. 556:

*"Provided, however,* That if a carrier other than a motor carrier is an applicant, or any person which is controlled by such a carrier other than a motor carrier or affiliated therewith within the meaning of section 5 (8) of part I, the Commission shall not enter such an order unless it finds that the transaction proposed will promote the public interest by enabling such carrier other than a motor carrier to use service by motor vehicle to public advantage in its operations and will not unduly restrain competition."

This proviso remains in the Interstate Commerce Act, § 5 (2) (b). 54 Stat. 906.

[4] "We appreciate, of course, that section 207, unlike section 5, does not require of a railroad, undertaking to prove that public convenience and necessity require a motor service which it proposes, any greater measure of proof than is required of any other applicant.   But this does not mean that it is as easy for one applicant, as for another, to prove need for a proposed service or that this Commission considering an application by a railroad for authority to perform an all-motor service, not in aid of its rail service but in competition therewith and with other motor carriers, can ignore the circumstance that such applicant is a railroad whose operation as proposed would ordinarily be inconsi[s]tent with the principles underlying the national transportation policy.   In other words, a railroad applicant for authority to operate as a common carrier by motor vehicle, though required to do no more than prove, as any other applicant, that its service is required by public convenience and necessity, has a special burden, not by reason of any attitude or action on our part, but by reason of the very circumstance that it is a railroad.   Where it fails

that the Commission, in this modification proceeding, was not acting under § 212 of the Interstate Commerce Act, authorizing changes or revocations in operating authority, but under claimed power subsequently to impose conditions to insure that the operations would be auxiliary to, or supplemental of, rail service; that Transit's operations were at all times auxiliary and supplemental to rail service within the Commission's definition of that service when the acquisitions were approved, and could not be changed or revoked except under § 212; that such restrictions as were proposed would interfere with the full motor common-carrier rights of Transit's predecessors guaranteed to them by the "grandfather clause," § 206, and transferred to Transit by a purchase approved by the Interstate Commerce Commission.

A glance at the proposed restrictions, *supra,* pp. 425–426, shows the practical disadvantages to Transit. It cannot carry on a general all-motor operation on its own billings or under motor rates, joint or local.[5] It cannot haul through motor traffic at rail tariffs between the "key points," Omaha, Des Moines and the Bettendorf-Rock Island-Moline center. Furthermore, Transit rests under the threat of possible future restrictions as need may be shown for their application to hold its operations, under changing conditions, to those then reasonably determined by the Commission to be needed to keep Transit's motor

to show special circumstances negativing any disadvantage to the public from this fact, a grant of authority to supply motor service other than service auxiliary to and supplemental of train service is not justified." *Rock Island Motor Transit Co.,* 40 M. C. C. 457, 471, 473–474; cf. *Kansas City Southern Transport Co.,* 10 M. C. C. 221, 237.

[5] Appellees deduce these limitations from the new condition (1), p. 425, *supra.* As the Commission does not challenge the statement, and the record shows that the Commission so treats such conditions, we accept that interpretation. 55 M. C. C. 567, 581 ff. See 41 M. C. C. 721, 726; text at n. 19, *infra.*

service auxiliary and supplemental to its parent's rail service.  Transit alleges that the restrictions would bar it from participation in traffic on the affected routes that now produce a gross revenue of more than a million dollars a year.  As damage to Transit, if the Commission order is enforced, was admitted, proof of the amount was dispensed with.

With the situation as above stated in mind, we take up the question of the validity of the Commission's action in this case.

*Statutory Authority.*—The Commission has power at the time of its approval of an application to limit the authority to be granted by certificates of convenience and necessity for the operation of motor carriers, whether the certificate is issued on an original application under § 207 or after acquisition under § 213 of the Motor Carrier Act, § 5 (2) Interstate Commerce Act.  Section 206 requires a certificate.  Section 207 gives discretion to the Commission according to the statutory standards of convenience and necessity to authorize a part or all of the requested operations.  The service must be performed according to the "requirements, rules, and regulations of the Commission."

The practice of the Commission from the beginning of motor-carrier regulation has been to restrict motor-carrier operations both geographically [6] and functionally.[7]  The same was true of railroad motor-carrier affiliates.  We think that at the time of issuance of the certificate, if the Commission reasonably deems the restriction useful in protecting competition, or for other statutory purposes,

[6] § 207: *"Provided, however,* That no such certificate shall be issued to any common carrier of passengers by motor vehicle for operations over other than a regular route or routes, and between fixed termini, except as such carriers may be authorized to engage in special or charter operations."

[7] *Crescent Express Lines* v. *United States,* 320 U. S. 401.

the Commission may require the railroad-affiliated motor carrier to perform only those services that are auxiliary and supplemental to the rail service. That the railroads made use of motor carriage primarily in such fashion was known to the Congress before the enactment of any regulatory legislation in the field.[8] Such a restriction is a logical method to insure the maximum development of the two transportation agencies—rails and motors—as coordinate transportation services in accordance with the Declaration of Policy, § 202 (a) of the Motor Carrier Act of 1935, 49 Stat. 543, later incorporated into the National Transportation Policy, prefixed to the Interstate Commerce Act of 1940, 54 Stat. 899. Specific statutory authority is found in the requirements of the proviso in § 213 (a) of the Motor Carrier Act of 1935 and § 5 of the Interstate Commerce Act as amended in 1940, quoted in note 3, *supra*. Railroad operations as motor carriers are forbidden by that acquisition section except to enable a railroad "to use service by motor vehicle to public advantage in its operations." [9]

[8] *Motor Bus and Motor Truck Operation*, 140 I. C. C. 685, 721, 745, 749; *Coordination of Motor Transportation*, 182 I. C. C. 263, 336 ff.; and see Report of the Federal Coordinator of Transportation on the Regulation of Transportation Agencies other than Railroads, S. Doc. No. 152, 73d Cong., 2d Sess. 15 ff., 35. Report of the Federal Coordinator of Transportation on Transportation Legislation, H. R. Doc. No. 89, 74th Cong., 1st Sess. 6.

[9] Proviso to § 5. See Commissioner Eastman, Hearings before Subcommittee of the Committee on Interstate Commerce, United States Senate, on S. 3606, 75th Cong., 3d Sess. 23:

"The reason for that proviso was that at the time when this act was under consideration by your committee, there was a feeling on the part of many that railroads, for example, ought not be permitted to acquire motor carriers at all. It was pointed out, in opposition to that view, that there were many cases where railroads could use motor vehicles to great advantage in their operations, in substitution for rail service, as many of them are now doing. Many railroad men, for example, feel that the operation of way trains has become

A spate of cases can be cited to support the practice, some of which were specifically called to Congress' attention prior to the enactment of the 1940 Act.[10]   With this knowledge that the Commission was granting certificates when it deemed the proposed railroad motor-carrier affiliates would operate as auxiliary to and supplemental of railroad service, Congress reenacted § 213 of the Motor Carrier Act in § 5 (2) of the Transportation Act of 1940. Such limitation was in furtherance of the National Transportation Policy, for otherwise the resources of railroads might soon make over-the-road truck competition impossible, as unregulated truck transport, it was feared, might have crippled some railroads.   Motor transportation then would be an adjunct to rail transportation, and hoped-for advancements in land transportation from supervised competition between motors and rails would not materialize.   The control of the bulk of rail and motor transportation would be concentrated in one type of operation.

---

obsolete; that the motor vehicle can handle such traffic between small stations much more economically and conveniently than can be done by a way train; and the motor vehicles are being used in that way by many railroads.   The same is true of many terminal operations.   The motor vehicle is a much more flexible unit than a locomotive switching cars, and it can be used to great advantage and with great economy in many railroad operations."

And see statements of Sen. Wheeler, 79 Cong. Rec. 5655, and Rep. Sadowski, 79 Cong. Rec. 12206.   Cf. *Interstate Commerce Commission* v. *Parker*, 326 U. S. 60.   See also § 212 (b).

[10] *E. g., Kansas City Southern Transport Co.*, 10 M. C. C. 221, 53d Annual Report of the Interstate Commerce Commission 107, November 1, 1939; *Pennsylvania Truck Lines, Inc.*, 5 M. C. C. 9, 51st Annual Report 68–69.   The Commission, in Appendix B to its brief in Nos. 38 and 39, *United States* v. *Texas & Pacific Motor Transport Co.*, decided today, *post*, page 450, has collected 120 cases, beginning in 1936 with vol. 1 of the Motor Carrier Reports, dealing with the issuance of certificates to motor subsidiaries of rail carriers. The great bulk of these cases makes specific reference to the auxiliary and supplemental standard.

Complete rail domination was not envisaged as a way to preserve the inherent advantages of each form of transportation.[11]

As indicated above in the text just preceding note 4, the Commission reads into § 207 the same requirement. Thus a consistent attitude toward the use of motors by railroads is maintained. It also relies on its understanding of the directions of the National Transportation Policy "to recognize and preserve the inherent advantages of each," rail, motor, and water; and its reliance on that Policy is further justified by the Whittington amendment stating that "all the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy." 54 Stat. 899.

But power in the Commission, before issuance of a certificate or approval of acquisition, to limit railroad motor operations so as to make them auxiliary and supplemental

---

[11] See Meck and Bogue, Federal Regulation of Motor Carrier Unification, 50 Yale L. J. 1376, 1408 ff. The Commission's view is evidenced in *Pennsylvania Truck Lines, Inc.*, 1 M. C. C. 101, 111:

"While we have no doubt that the railroad could, with the resources at its command, expand and improve the partnership service and that, so far as numbers are concerned, there is now an ample supply of independent operators in the territory for the furnishing of competitive service, we are not convinced that the way to maintain for the future healthful competition between rail and truck service is to give the railroads free opportunity to go into the kind of truck service which is strictly competitive with, rather than auxiliary to, their rail operations. The language of section 213, above quoted, is evidence that Congress was not convinced that this should be done. Truck service would not, in our judgment, have developed to the extraordinary extent to which it has developed if it had been under railroad control. Improvement in the particular service now furnished by the partnership might flow from control by the railroad, but the question involved is broader than that and concerns the future of truck service generally. The financial and soliciting resources of the railroads could easily be so used in this field that the development of independent service would be greatly hampered and restricted, and with ultimate disadvantage to the public."

to rail service does not necessarily imply power to change the conditions designed to bring about the desired coordination, after issuance of the certificate. The parent railroad may have acquired or developed its motor affiliate in reliance on the conditions stated in the certificate. So far as the present case is concerned, there is a provision, quoted above, pp. 423–424, making the certificate for the White Line operation subject to further limitations, restrictions or modifications the Commission might find necessary to insure a continuance of auxiliary and supplemental operation and to avoid undue restraint on competition. It was a clause like this in *Interstate Commerce Commission* v. *Parker,* 326 U. S. 60, that occasioned the comment that "if the Commission later determines that the balance of public convenience and necessity shifts through competition or otherwise, so that injury to the public from impairment of the inherent advantages of motor transportation exceeds the advantage to the public of efficient rail transportation, the Commission may correct the tendency by restoration of the rail movement requirement or otherwise." *Id.* at 71–72. As the issue in the *Parker* case was the right to issue certificates to railway subsidiaries when existing over-the-road motor carriage might have been utilized, no determination was made there as to whether or not such a reservation was valid. Its effect on the present issues comes from the ruling there made that the Commission had power to balance the public interests in the different methods of transportation so as to preserve the inherent advantages of each, even though its action might bring some disadvantage to one system or the other. This duty was said to have been imposed upon the Commission by the National Transportation Policy. *Id.* at p. 66.

When competition, public interest in the preservation of the inherent advantages of rails and motors, and use of motor service by railroads in their operations are the basis, as they are (see National Transportation Policy,

54 Stat. 899 and § 5 (2) (b)), for allowing acquisitions of motor routes by railroads, we think it consonant with that policy to reserve the right to make further limitations, restrictions or modifications to insure that the service remain auxiliary or supplemental. Congress could not have expected the Commission to be able to determine once and for all the provisions essential to maintain the required balance. Such a reservation, of course, does not provide unfettered power in the Commission to change the certificate at will. That would violate § 212, allowing suspension, change or revocation only for the certificate holders' willful failure to comply with the Act or lawful orders or regulations of the Commission. The reservation by its terms does not offend against the provision of § 212 that a certificate "shall remain in effect until suspended or terminated," as § 212 provides. The Commission asserts the modifications were made in accordance with the certificate. The reservation would not authorize changes in operation or service unconnected with the plan of coordinated operation; and indeed Transit was not originally authorized to operate independently and at large. What the reservation does allow are changes to insure that the operations will continue as auxiliary or supplemental to the train service.

The consolidation section, § 5 (2), permits a railroad to purchase a motor carrier only "with the approval and authorization of the Commission." That approval is contingent upon a finding of public advantage and lack of undue restraint on competition. Then approval is to be made "upon the terms and conditions, and with the modifications, so found to be just and reasonable."

We note the directions of § 208 as to the certificate, requiring that it "shall specify the service to be rendered" and that "there shall, at the time of issuance and from time to time thereafter, be attached to the exercise of the privileges granted by the certificate such reasonable terms, conditions, and limitations as the public conven-

ience and necessity may . . . require." We note also §§ 216 (c) and 217 (a) with their provisions allowing common carriers by motor to establish through routes and joint rates with other carriers, motor or otherwise. Sections 208, 216 (c) and 217 (a) with their general provisions do not in our opinion override the specific requirement of the National Transportation Policy that the inherent advantages of all modes of transportation be retained, or of § 5 that acquisition of motor routes by railroads shall require the above special findings and may be subject to special conditions. Section 208 does not seem to conflict with § 5 (b), and § 216 (c) is based on voluntary action. And we need not pause over the contention that limitations placed upon rail-owned motor carriers transform them from common into contract carriers under the definitions in § 203.

The language of the proviso of § 5 (2) (b), we hold, gives the Commission power to enforce the reservation in the certificate set out on pp. 423–424, *supra.* We turn then to the question whether the five directed modifications of the certificate, pp. 425–426, *supra,* fairly may be said to be of a character auxiliary to or supplemental of train service and not such a change or revocation in part as is contemplated by the procedure of § 212, for failure to comply with statutory or regulatory provisions.

*Auxiliary and Supplemental.*—The Interstate Commerce Act sets out only generally requirements that must be met by railroad applicants for motor-carrier certificates. In acquisition cases under § 5 (2) the certificate is not to be issued without the statutory findings discussed above that the proposed merger or consolidation will be in the "public interest" and that the railroad can use the motor service "to public advantage in its operations."[12]

---

[12] In original applications under § 207, the fact that the applicant is a railroad brings up other questions of transportation policy. See note 4, *supra.*

The words "auxiliary to or supplemental of" [13] are not taken from the Act. There is no such specific limitation for railroad operation of motor carriers. Their connotation is to be gathered from the context in which they have been employed by the Commission. The certificate, pp. 423–424, *supra,* used the phrase to avoid undue restraint on competition. That has been its use from the beginning. The only competition at which the limitation was directed was full railroad competition with over-the-road motor carriers. Appellees urge that the meaning of the words is limited by its application through the restrictions on the certificates at the time it was issued, December 3, 1941.

Appellees assert that under their certificate they could and did transport at either rail or truck billing and rates, with no restriction of movement along the route. The auxiliary and supplemental requirement, they argue, is adequately complied with by restricting the service to points "which are also stations on the lines of The Chicago, Rock Island and Pacific Railway Company." The Commission, appellees contend, was functioning with this geographical concept of auxiliary and supplemental in mind when, in 1941, reservation was made in Transit's certificate. To support this assertion, appellees call attention to the case in which the phrase "auxiliary and supplementary" was first applied to authorize motor service of railroad affiliates, *Pennsylvania Truck Lines, Inc.— Barker Motor Freight,* 1 M. C. C. 101 at 113, October 8, 1936.[14] Later, in 5 M. C. C. 9, March 6, 1937, the form

---

[13] The variant "auxiliary to or supplementary to" appears to be used interchangeably with "auxiliary to and supplemental of."

[14] "2. That the service to be rendered by the Barker Motor Freight, Incorporated, in the event the pertinent applications now pending before the Commission are subsequently approved by us, be confined to service auxiliary and supplementary to that performed by the Pennsylvania Railroad Company in its rail operations and in territory parallel and adjacent to its rail lines."

was changed as shown below.[15]   That this authorization permitted general motor-carrier service along the rail lines, appellee states, is shown by *Pennsylvania Truck Lines, Inc., Extension—Lebanon, Ohio,* 47 M. C. C. 837, decided January 6, 1948.[16]   See also, *Southern Pacific Company—Valley Motor Lines, Inc.,* 39 M. C. C. 441, 447.[17]

[15] "Provided, however, (1·) that operations under the authority herein granted shall be confined between the points and over the routes described in the appendix, (2) that the authority herein granted shall not be construed to include the right of rendering service from or to, or the interchanging of traffic at, any point other than a station of the Pennsylvania Railroad Company, . . . ."   5 M. C. C. at 15.

[16] "Under the Barker certificate applicant performs two distinct types of service; (1) substituted service for the railroad, and (2) independent motor carrier service for the general public.   The latter service involves the transportation of general commodities, in any quantity, under motor carrier bills of lading and tariffs and at motor carrier rates. . . .   Substituted service was being performed by applicant at the time of the hearing in January, 1945, over several routes most of which radiate out of Pittsburgh and Columbus.   Independent service also was being performed at that time only over regular routes extending principally between the following points: . . . . Applicant has its own agents and representatives who deal with the shippers in the performance of the independent service.   In January 1945, 200 units of equipment were being used in independent service and 500 in substituted service."

[17] "The only definite restriction on the operating authority which was imposed in the *Barker case* and later cases has been designed to confine the motor-carrier operations acquired to the territory of the railroad through limiting the rights so as to authorize service only at stations on the railroad.   Although, at times, a condition formerly was sometimes included in acquisition cases to the effect that service to be rendered should be 'auxiliary and supplementary' to the railroad's service, there has been no indication in the reports that such condition was intended to prohibit rendition of all motor-carrier service directly for the shipping public under the operating rights in *addition to,* in *substitution for,* and in *lieu of,* the parent railroad's service, or to restrict the operation *solely* to one in combination with the railroad's operation; nor is it our understanding that it has been so construed by the carriers."

The Commission asserts that the meaning of "auxiliary and supplemental" as used in the Barker Purchase and thereafter was not geographical. This, it says, is shown by the explanation in 5 M. C. C. at p. 11, a later Barker report and order.[18] In 1943, after the certificate here in question was issued, the Commission defined "auxiliary and supplemental" in the *Texas & Pacific Motor Transport Company Application*, 41 M. C. C. 721.[19] The Com-

[18] "The scope of the operations proposed to be retained is broader than intended by the conditions we stated in our prior report. Hence, it will be of advantage to the parties in this and later proceedings if we here amplify the meaning of those conditions. Approved operations are those which are auxiliary or supplementary to train service. Except as hereinafter indicated, nonapproved operations are those which otherwise compete with the railroad itself, those which compete with an established motor carrier, or which invade to a substantial degree a territory already adequately served by another rail carrier.

"Approved operations are best illustrated by the substitution of trucks for peddler or way-freight service in what is commonly called 'station-to-station' service."

[19] "Condition 1 [same as condition 1, p. 425, *supra*] limits the character of service to be performed by the petitioner to that which is auxiliary to or supplemental of the rail service of the railway. It limits the service to be performed by truck to the transportation of the rail traffic of the railway. It permits the public to receive an improved rail service through the use of trucks instead of trains as a means of fulfilling the railway's undertaking to transport. Petitioner's status as a common carrier by motor vehicle is not dependent upon its having direct dealings with the shipping public. *Willett Co. of Indiana, Inc., Extension—Ill., Ind., and Ky.*, 21 M. C. C. 405. Its service is necessarily limited to points served by the railway, hence condition 2. Condition 1 permits all-motor movements in the handling of rail traffic at railroad rates and on railroad bills of lading. To and from certain points on segments of the rail lines, the improved service was to be accomplished by performing the movements partly by train and partly by motor vehicle, an auxiliary or supplemental service coordinated with the train service, hence condition 3. Since petitioner's certificates limit the service to be performed to that which is auxiliary to or supplemental of the rail service of the railway, it is without authority to engage in operations unconnected with the

440

mission notes that the *Valley* case, *supra,* came after *Texas & Pacific,* and now considers it disapproved by a subsequent denial of reconsideration of *Texas & Pacific.* 55 M. C. C. 567, 584–585. The question has evidently produced a difference of opinion in the Commission.[20]

Appellees charged that the Commission had tightened its "concept of what is auxiliary to, or supplemental of, rail service." 55 M. C. C. 567, 583. The Commission refused to accept that assumption and therefore did not

---

rail service and, accordingly, may not properly be a party to tariffs containing all-motor or joint rates, nor participate in a directory providing for the substitution of train service for motor-vehicle service at its option. To the extent petitioner is performing or participating in all-motor movements on the bills of lading of a motor carrier and at all-motor rates, it is performing a motor service in competition with the rail service and the service of existing motor carriers; and, to the extent it is substituting rail service for motor-vehicle service, the rail service is auxiliary to or supplemental of the motor-vehicle service rather than the motor-vehicle service being auxiliary to or supplemental of rail service." P. 726.

[20] See *Kansas City Southern Transport Co.,* 28 M. C. C. 5, 24; *Rock Island Motor Transit Co. Extension, Eldon, Iowa,* 33 M. C. C. 349, 361; *Rock Island Motor Transit Co.—Purchase—White Line,* 40 M. C. C. 457, 478.

"As previously stated, from the date of the decision in the *Barker* case to shortly before enactment of the Transportation Act, 1940, the principles there recognized and applied, controlled the disposition of practically every rail-motor acquisition case. However, beginning with *Frisco Transp. Co.—Purchase—Reddish,* 35 M. C. C. 132, and continuing until quite recently, the practice of specifically reserving the right later to impose such restrictions as might be necessary to insure that future operations under the acquired authority should be limited to the rendition of service auxiliary to, or supplemental of, train service was not followed. With such departure from the former practice there also appears to have developed a tendency in rail-motor acquisition proceedings to treat the *Barker* case restrictions as geographical or territorial only in their intent rather than as substantive limitations upon the character of the *service* which might be rendered by a railroad or its affiliate under any acquired right." 40 M. C. C. at 469.

discuss the necessity of proceeding under § 212 in changing or partially revoking the certificate. It held:

"We conclude that approval of the acquisition by Transit was solely for the purpose of enabling Transit to perform a service auxiliary to and supplemental of rail service; that such intent or purpose was adequately evidenced by the report of division 5 including the reservation of a right specifically to restrict if need should be found; that Transit has no cause for any complaint that it was misled to its prejudice and that our concept at the time of the original decision herein, as to what constitutes service auxiliary to or supplemental of rail service, though now described in greater detail, has not been revised to Transit's prejudice; and that there is no element of unfairness in our exercise now of any authority which we have to restrict future operations." 55 M. C. C. 567, 585.

It is to be noted also that the examiner's report on the White Line Purchase in 1938 recommended "that no truck service shall be conducted at other than rail rates." On objection by appellee this requirement was eliminated. 5 M. C. C. 451, 458; 55 M. C. C. 567, 576 ff.; 90 F. Supp. 516, 518. Furthermore, the Commission required the appellee to file tariffs for truck rates and truck billing with the Commission. 90 F. Supp. 516, 518. The District Court concluded as a matter of law as follows:

"3. Prior to and at the time of the approval of the White Line transaction and the issuance in said proceeding of plaintiff's certificate, and at the time of the approval of the acquisition of the Frederickson certificate, the term, 'auxiliary to and supplemental of train service' did not prohibit the rendition of all-motor service directly for the shipping public at all-motor rates in addition to service at rail rates in

substitution for and in lieu of the rail service of plaintiff's affiliated railroad."

What was in the Commission's mind as to the meaning of auxiliary and supplemental at the time it issued its certificate, we cannot be sure. At present a motor service is auxiliary and supplemental to rail service, in the Commission's view, when the railroad-affiliated motor carrier in a subordinate capacity aids the railroad in its rail operations by enabling the railroad to give better service or operate more cheaply rather than independently competing with other motor carriers. Undoubtedly the Commission has not consistently required each rail-affiliated motor carrier to forego motor billings or tariffs. Key points to break traffic are relatively new. 28 M. C. C. 5. Rail affiliates have been permitted to leave the line of the railroad to serve communities without other transportation service.[21] Those divergences, however, are an exercise of the discretionary and supervisory power with which Congress has endowed the Commission. It is because Congress could not deal with the multitudinous and variable situations that arise that the Commission was given authority to adjust services within the limits of the Motor Carrier Act. § 208. The Commission has continually evidenced, as indicated above, by opinion and certification its intention to have rail-owned motor carriers serve in auxiliary and supplemental capacity to the railroads.

Appellees urge that the new conditions mark a new Commission policy; that it is such a change in the certificate as was condemned in the case of water carriers by *United States* v. *Seatrain Lines*, 329 U. S. 424, 428. Without relying upon the statutory differences between Commission power over motor and water carriers, pp. 429–

---

[21] *Rock Island Motor Transit Co. Extension—Wellman, Iowa*, 31 M. C. C. 643. See 55 M. C. C. 567, 584.

432, we believe that case is inapplicable to these circumstances. In *Seatrain* a certificate was granted to carry "commodities generally." For the Commission then to modify this to "in railroad cars only" or "except in railroad cars" would limit the freight authorized to be carried by the certificate. Transit's certificate, on the other hand, required service auxiliary and supplemental to rails, and the modification was not a change of policy as to that but an additional requirement to insure coordinated service. The new conditions, pp. 425–426, *supra,* are of a character that aids rail operation and minimizes competition with over-the-road motor carriers. Such added conditions are not changes in or revocations of a certificate in whole or in part but a carrying out of the reservation in the certificate.

The Commission has expressed its policy to limit rail affiliates to services in aid of rail transportation by the phrase, perhaps too summary, auxiliary and supplemental. Though the phrase is difficult to define precisely, its general content is set out in *Texas & Pacific Motor Transport Co. Application,* 41 M. C. C. 721, 726, quoted n. 19, *supra.* While the practice of the Commission has varied in the conditions imposed, the purpose to have rail-connected motor carriers act in coordination with train service has not. Circumstances change. Different conditions are required under different circumstances to maintain the balance between rail and motor carriage. We do not think the meaning of auxiliary and supplemental is limited to the Commission's practice at any particular time. So long as it may fairly be said that the practice required from the motor carrier falls within the meaning the Commission has given to auxiliary and supplemental, the condition is valid.

Such restrictions hamper railroad companies in the use of their physical facilities—stations, terminals, warehouses—their personnel and their capital in the development of their transportation enterprises to encompass all

or as much of motor transportation as the roads may desire. The announced transportation policy of Congress did not permit such development.[22] We hold that the new conditions are within the limits covered by the reservation of power to impose such further limitations as might be found necessary "to insure that the service shall be auxiliary or supplementary to the train service" of The Chicago, Rock Island and Pacific Railway Company.

*Frederickson Purchase.*—The statement of facts at the beginning of this opinion shows the Fredericksons possessed certificates issued under the proviso of § 206, the "grandfather clause." Transit agreed to purchase these rights subject to the approval of the Commission. This approval was given by a report and order. The order approved the purchase of the "operating rights and property . . . subject to the terms and conditions set out in the findings in said report." The findings complied with § 5 (2) (a) and (b) of the Transportation Act. They stated, "The Rock Island Motor Transit Company will be entitled to a certificate covering the previously-described portion of rights granted in Nos. MC–530 and MC–530

---

[22] And cf. National Resources Planning Board, Transportation and National Policy (1942), H. R. Doc. 883, 77th Cong., 2d Sess., pp. 155, 156:

"In the present highly dynamic state of the transportation industry, it would be national folly to place the agencies in any kind of strait jacket. Each mode needs an opportunity to grow and change with the times. No drastic move to allocate traffic arbitrarily or to achieve a similar end by indirect means should be permitted private concerns or forced upon them by Government. The public has struggled long and taxed itself heavily to develop the newer agencies and to revive the old for the purpose of weakening the monopolistic position once occupied by the railroads and of improving and expanding the services offered to users. It would be unfortunate if public policy or private practice were now employed to halt and reverse this trend, and thus to turn back the hands of the transportation clock to an earlier time."

(Sub–No. 1), which rights are herein authorized to be unified with rights otherwise confirmed in The Rock Island Motor Transit Company, with duplications eliminated; . . . ." The words "previously-described portion of rights granted" cover the Frederickson certificates as "a motor-vehicle common carrier of general commodities over regular routes between" named points. The Frederickson certificates also covered irregular routes for certain commodities. These latter rights were not purchased. The rights purchased were over-the-road motor-carrier rights. Neither those certificates nor the report or order on the purchase application contained anything specifically limiting the operations to service auxiliary to and supplemental of the Rock Island train service. There was a finding, in the words of the proviso to § 5 (2) (b), that the purchase "will enable The Chicago, Rock Island and Pacific Railway Company . . . to use service by motor vehicle to public advantage in its operations." The transaction was consummated in January 1945, over six years after the approval of the White Line Purchase and over three years after the issue of that original certificate, hereinbefore discussed.

The basic question posed as to this purchase is similar to that in the White Line Purchase. Has the Commission power to place in the Frederickson certificates the modifications ordered for the White Line certificate? We will solve the problem by determining that the order approving the purchase has not the finality of a certificate but is rather only a tentative approach to the consummation of the purchase subject to changes in conditions and requirements. The power to issue the certificate with the White Line modified conditions follows, *a priori,* from what we have said in the foregoing division of this decision. This leaves unanswered the question of the power of the Commission to modify a railroad-affiliated motor carrier's certificate so as to make its operation auxiliary to and sup-

plemental of the rail service, when no reservation for or restriction to that effect has been placed in the order directing the issue of the certificate or the certificate itself. If any such procedure should be undertaken by the Commission, that answer should await a fully developed statement and argument by the interests affected. Our reasons for holding that the Commission may validly insert the proposed limitations in the certificate follow.

Closings of loans and purchases involve nice timing adjustments. The transportation industry is familiar with the complexities of closings involving clearances or impositions of prior and underlying mortgages and partition of obligations among syndicates of lenders or purchasers, from rail system mortgages to secure various classes of obligees in reorganizations to simple borrowings for trusteed equipment. It understands the business risks of purchase or sale ahead of final commitment by a separate entity. A request for a statement of the terms of the proposed certificate of convenience and necessity would doubtless have been complied with by the Commission. If not, the closing with Frederickson could have been made by escrow or otherwise simultaneously with the issue of the certificate.

Transit had had experience with the problems of coordination between rail and motor service.[23] In this application it objected to a limitation on freight of immediately prior or immediately subsequent rail carriage.

---

[23] "Certain of Transit's present freight operations are subject to the limitation that service shall be solely that which is auxiliary to and supplemental of the train service of the railroad, and either that freight so handled shall have an immediately prior or subsequent rail haul by the railroad, or that it shall not be transported from, to, or between more than one of specified key points. However, its route between Atlantic and Omaha, Nebr., over U. S. Highway 6, serving all points which are stations on the railroad, is part of a route to and from Chicago, Ill., via Des Moines, acquired pursuant to

The limitation was not put in the report as a condition. While the report stressed the rail operating advantages of the use of trucks, it did not deal with the terms auxiliary and supplemental. If the problem of limitation of the certificate to motor service in rail operation occurred to the applicant or the Commission, precedents from the *Barker* case to the White Line application would have indicated an inclusion in the certificate of a limitation of auxiliary to and supplemental of rail service.

Transit maintains that the order is final; that the result is the same as though the service requirements of the order of approval were written into the operating certificate as directed by the statute. § 208. "The decisions of the Commission," argues Transit, reflect "finality of action." [24] Neither of the latter two cases in the note bear in any way on the present point. In both, certificates had been issued and the Commission said, in so many words, the certificates are final. In the *Smith Bros.* case, it added:

> "We may issue decision upon decision, and order upon order, on an application for a certificate so long as sufficient reason therefor appears and until all controversy is determined, but once a certificate, duly and regularly issued, becomes effective, our authority to terminate it is expressly marked off and limited. All the antecedent decisions and orders are essentially procedural in character, and may be set aside, modified, or vacated, but the certificate marks the end of

authority granted in *Rock Island M. Transit Co.—Purchase—White Line M. Frt.*, 5 M.C.C. 451, and is not so restricted." *Chicago, Rock Island & Pac. R. Co.—Purchase—J. H. Frederickson, etc.*, 39 M. C. C. 824 (no printed report).

[24] *United States* v. *Seatrain Lines*, 329 U. S. 424; *Boulevard Transit Lines* v. *United States*, 77 F. Supp. 594, 595; *Smith Bros., Revocation of Certificate*, 33 M. C. C. 465, 472.

the proceeding, just as the entry of a final judgment or decree marks the end of a court proceeding." P. 472.

What slight bearing *Seatrain* has weighs on the side of the interlocutory character of the approval order. The sentence referred to reads:

"But, as the Commission has said as to motor carrier certificates, while the procedural 'orders' antecedent to a water carrier certificate can be modified from time to time, the certificate marks the end of that proceeding." P. 432.

As under the statute, §§ 206, 207, 208, motor carriers must have certificates authorizing their operations, we conclude that the certificate is the final act or order that validates the operation. Until its form and content are fixed by delivery to the applicant, the power to frame it in accordance with statutory directions persists.

It may be said that, as the order permitted Transit to purchase the Frederickson "operating rights," it must have freedom to use all the seller's motor-carrier privileges; that the absence of a reservation defeats Commission power to insert "auxiliary and supplemental" restrictions in the certificate. Since we hold the order of approval is not the final order, we reject the premise.

*Other Objections.*—A number of other objections to the enforcement of the orders were presented by appellees and considered by the Court. We comment briefly on those we think merit notice. "Grandfather rights" under § 206 of the Transportation Act were the basis of the White and Frederickson applications for certificates of convenience and necessity. Transit acquired the sellers' rights to certificates. Appellees contend that as the sellers were entitled to broader operating rights than are allowed the purchaser under the modified certificate, the

right to "substantial parity between future operations and prior *bona fide* operations" guaranteed by § 206 is infringed by limiting the motor service to that auxiliary and supplemental to rail service.[25]   A railroad purchaser does not necessarily receive all rights a certificate holder possesses.   Because of the National Transportation Policy and § 5, making a railroad's purchase subject to conditions, as hereinbefore described, approval may be conditioned by the Commission on the railroad purchaser's willingness to accept a narrower certificate than that possessed by the seller.

Finally, the appellee asserts that its certificate is property akin to a franchise; that it has invested large sums in the acquisition and equipment of its routes and service, and that what it alleges is revocation deprives it of property without due process of law.   We think that our previous holding in this decision that Transit took its certificate and obtained approval of its acquisitions to operate in the aid of the railroad, auxiliary and supplemental thereto, makes it obvious that Transit had nothing of which it was deprived by the contested order.

The judgment of the three-judge District Court is reversed and the proceeding is remanded with directions to dismiss the complaint.

*Reversed.*

Mr. Justice Black, Mr. Justice Douglas, Mr. Justice Jackson and Mr. Justice Burton dissent and would affirm the District Court's opinion.   They are of the opinion that the Commission partially revoked the certificates involved in a manner not authorized by the Interstate Commerce Act.

---

[25] The phrase is derived from *Alton R. Co.* v. *United States,* 315 U. S. 15, 22, followed in *United States* v. *Carolina Freight Carriers Corp.,* 315 U. S. 475, 481.