**SOUTHEASTERN AVIATION, INC.,**
Petitioner

v.

**CIVIL AERONAUTICS BOARD,**
Respondent,
Lake Central Airlines, Inc., Southern Airways, Inc., Tennessee Aeronautics Commission, Intervenors.

**No. 15566.**

United States Court of Appeals
District of Columbia Circuit.

Argued June 2, 1960.

Decided Sept. 22, 1960.

Petition for Rehearing Denied
Oct. 17, 1960.

Mr. Albert F. Beitel, Washington, D. C., and Mr. Ross Reid, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, for petitioner.

Mr. Robert L. Toomey, Attorney, Civil Aeronautics Board, with whom Messrs. Franklin M. Stone, General Counsel, Civil Aeronautics Board, John H. Wanner, Deputy General Counsel, Civil Aeronautics Board, O. D. Ozment, Associate General Counsel, Litigation and Research, Civil Aeronautics Board, Morris Chertkov, Attorney, Civil Aeronautics Board, and Richard A. Solomon, Attorney, Department of Justice, were on the brief, for respondent.

Mr. Cecil A. Beasley, Jr., Washington, D. C., with whom Messrs. R. J. Shortlidge, Jr., and John W. Kern, III, Washington, D. C., were on the brief, for intervenor Southern Airways, Inc.

Mr. Albert F. Grisard, Washington, D. C., was on the brief for intervenor Lake Central Airlines, Inc.

Mr. Norman A. Flaningam, Washington, D. C., was on the brief for intervenor Tennessee Aeronautics Commission.

Before BAZELON, BASTIAN and BURGER, Circuit Judges.

BURGER, Circuit Judge.

Petitioner, Southeastern Aviation, Inc., ("Southeast") is a local intra-state airline certificated by the State of Tennessee. It is wholly owned and controlled by a trucking line, Mason and Dixon Lines, Inc. Intervenor, Southern Airways, Inc., is a federally certificated airline with extensive routes serving the southeastern part of the country. Southeast seeks review of an order of the Civil Aeronautics Board [1] to the extent that it grants Southern certain routes in Tennessee which Southeast actively sought.

The proceedings under review grew out of an application by Southern for new routes in Tennessee, Alabama and Georgia as extensions of its existing system. Consolidation of various competitive applications followed, including one by petitioner for federal certification substantially along the lines of its existing state certified service. Extensive hearings were held, after which the Hearing Examiner determined that petitioner Southeast be awarded two federally certificated routes in Tennessee subject to certain conditions: (a) No federal subsidy be given Southeast, and (b) that Mason and Dixon Lines, Inc., divest itself of control of the airline. The Examiner further found that Southern was not an applicant for these routes since it had not actively prosecuted its application.

Upon review by the Civil Aeronautics Board, the Examiner's decision was reversed.[2] Petitioner's application was rejected in toto, and Southern was awarded a route in Tennessee parallel to Southeast's state certificated service at 5 points: Tri-Cities, Knoxville, Chattanooga, Shelbyville/Tullahoma, and Nashville. The Board reasoned (1) that public convenience and necessity require the establishment of federally certificated air service in Tennessee; (2) that Southern was an applicant for the route since

it had clearly indicated a willingness to serve the area if the Board found such service necessary; (3) that comparative consideration of both applicants with regard to financing, service and cost of operations indicated Southern would "provide greater overall public benefits"; (4) that while either airline would need and be eligible for federal subsidy, air service would be provided by Southern "at considerably less cost to the government." It further found that Southeast did not demonstrate that the public interest required air service controlled by a surface carrier, and absent such a showing, it agreed with the Examiner's action requiring Mason and Dixon Lines, Inc. to divest itself of control of Southeast under National Air Freight Forwarding Corp. v. Civil Aeronautics Board, 1952, 90 U.S.App.D.C. 330, 197 F.2d 384; see American Trucking Ass'ns v. United States, 1957, 355 U.S. 141, 78 S.Ct. 165, 2 L.Ed.2d 158; United States v. Rock Island Motor Transit Co., 1951, 340 U.S. 419, 71 S.Ct. 382, 95 L.Ed. 391.

Southeast appeals the Board decision upon four grounds:

(a) The Board did not find the existing Southeast state certified service inadequate nor did it specifically find that Tennessee could support two parellel state and federal routes. Absent such preliminary findings, it could not certify a federal route that would destroy adequate service now being rendered under state authority.

(b) The Board erred in arbitrarily demanding Mason and Dixon Lines, Inc., divest itself of control of Southeast.

(c) The Board improperly reversed the Examiner's finding that Southeast was "fit, willing and able" to provide service.

(d) The Board denied Southeast a full and fair hearing and due process of law.

1. Southeastern Area Local Service Case, Order No. E–14754 (Dec. 18, 1959), rehearing denied, Order No. E–15168.

2. Only three members were on the board at this time. One member dissented.

**(1.)**

Southeast's primary argument is that the Board cannot certify Southern without first determining that the existing state certified service is inadequate, and that Tennessee could support two carriers on parallel routes. Essentially, this argument is directed at whether the "public convenience and necessity" demands federally certificated service in Tennessee.

We note first that the Board specifically found a need for such service, citing the significant population and economic growth of the area, the inadequacy of existing railroad and other surface facilities to meet growing demands, the dependence on "inconvenient bus or automobile travel not adaptable to the needs of industrial and commercial enterprises," and the paucity of presently existing federally certificated local air service.[3] All applicants before the Board agreed that federally certificated air service was necessary. The entire proceeding was directed to determining which of the competing airlines could best furnish it. Indeed, Southeast tacitly, if not affirmatively, recognized the need by seeking such certification.

The reason for such need is not difficult to discern. Federally certificated airlines are eligible for federal subsidy as well as other benefits such as interline connections and mail carrying privileges. Short haul operations are extremely expensive; in most cases, as the Board pointed out, some subsidy is necessary in order that the local line survive. There is no evidence indicating that the State of Tennessee would, or could, provide the necessary cushioning. The obvious conclusion reached by petitioner, and by the Board, was that federal certification and its attendant economic benefits were necessary in order that Tennessee gain the air service best suited for its, and the nation's, welfare.

■ The record bears out this conclusion. In the hearings below, Southeast repeatedly stressed its desire for such certification. Examples of this are set out in the margin.[4] Southeast's president, King, also submitted an affidavit which, after pointing out the difficulties of non-federally certificated small carriers, stated:

> " * * * *I believe that it is impossible to conduct all of our proposed services without the certification applied for.* This, of course, is not peculiar to Southeast. According to my information, every local service carrier has these privileges which we seek. (Emphasis added.)
>
> *    *    *    *    *    *

---

3. Prior to the proceedings Tennessee had only 154 miles of federally certificated local service.

4. "[Hearing] Examiner Pfeiffer: Let me ask the question this way, Mr. King [President of Southeast]: Do you think that you can ever break even with a DC–3 operation within the state of Tennessee? Let me add to that.

"I have heard testimony in other proceedings that you require at least a 78 per cent load factor on a DC–3 in order to break even, and that is impossible because of the local service character of the operation, you have passengers getting on the airplane and reserving space half-way down the line, so that there are many times when seats must operate empty, and therefore it is impossible to obtain, as a practical operating condition, an average of a 78 per cent load factor, and for that reason a DC–3 operation can never be profitable, or even break even.

"Does that agree with your view of the situation?

"The Witness: Mr. Examiner, I am glad you said that instead of me, but that is about the way I feel about it."

Mr. King later testified:

"Well, I do not think that the State of Tennessee would subsidize Southeast to serve. I personally feel that the State of Tennessee has paid its prorata share of taxes with which air carriers in other States have been subsidized. I feel that Tennessee has not had its fair share of local carrier service, and that it is entitled to participate at least to the extent the other States have, and this I think would put them in a comparable position, subsidywise, so far as the Government is concerned, and service wise so far as the carrier is concerned, I think it would be a fair and equitable transaction for the benefit of the people of Tennessee.

"* * * We now realize that Southeast Airlines cannot serve all of the cities for which it has applied, and to which service is required, unless it is given full certification by this Board. * * *"

Finally, Southeast, in its argument to the Examiner stated:

"At the outset, it should be noted that all of the service proposed cannot be provided without some subsidy support. All parties are in agreement on this point, as should be expected. Every local service carrier is supported by subsidy today, and there is no reason to believe that complete service throughout this entire area can be provided without any subsidy at all. It is possible to ascertain from the record the amount of subsidy which will be required."

Nor was Southeast's concern unwarranted. Its own exhibits showed it had been suffering serious and substantial losses throughout its career, as shown by a net loss of over $177,000 for the first quarter of 1958, and over $104,000 for the second quarter. Moreover, both the Examiner and the Board found that Southeast substantially underestimated its proposed operating cost, which, of course, would mean that its future losses would be greater than anticipated. The examiner estimated an operating loss of $350,000 annually if Southeast operated upon a non-subsidized basis.

In addition to these difficulties, Southeast's financial structure cannot be regarded as strong. At present, Mason and Dixon holds a $500,000 mortgage on Southeast's equipment. The original capitalization of $500,000 had been dissipated by operating losses, and an additional $300,000 had been advanced by Mason and Dixon to Southeast to cover expenses. No interest had been charged on the advance. Certain administrative expenses heretofore absorbed by its corporate parent will, in the future, be taken over by Southeast, and this is true whether or not Mason and Dixon is forced to divest its control. There is also a serious question whether Mason and Dixon would continue to absorb these losses without subsidy.

In short, all applicants sought, for good if differing reasons, the advantages of federal certification. The total record indicates that Tennessee can gain adequate local air service only through a federally certificated line. While it is true that Southeast witnesses testified it could operate the particular route at issue without federal subsidy, the Hearing Examiner himself expressed doubts as to whether such operation was feasible, and suggested the necessity of state subsidization. Realistically, then, the problem was not whether the existing state service was adequate, nor whether Tennessee could support two parallel lines, but rather which of many competing lines, seeking federal certification, among them Southeast, would best qualify.

(2.)

We next consider whether the Board was arbitrary in granting the route to Southern after comparative consideration with other applicants. Southeast urges that the Board improperly reversed the Examiner's finding that Southeast was able to provide the service. It should be noted, however, that the Examiner based his decision on a finding that local area operations in Tennessee did not warrant the large expenditure of subsidy funds necessary to sustain it. The Board disagreed, pointing out the imperative need for such local service (which no applicant denies), and further pointing out that to deny Tennessee the benefits available to similar operations in other states would be "discriminatory." Decisions as to the criteria applicable to subsidy grants are in a peculiar sense policy matters for the Board itself and the Examiner's views on this aspect cannot be upheld as against the judgment of the Board.

Considering all applicants on an equal footing as far as availability for subsidy was concerned, the Board then found that Southeast had experienced substantial losses and had not shown

that certification would improve its revenues, that a system larger than the proposed 650 miles was necessary in order to spread indirect costs and compete with trunk lines, and that the Tennessee routes would integrate with Southern's existing system, resulting in substantial benefits to passengers and terminals beyond Tennessee. It concluded that the "prospective public benefits proposed by Southeast are far less than will be provided by Southern and at substantially less cost to the Government." These findings, in addition to those portraying Southeast's weak financial structure, are not unwarranted on this record.

■ Southeast presents an appealing picture of the small independent enterprise struggling to give service. Its performance record for the public, which the Board considered, appears to be good. But the Board was also required to take into account Southeast's consistent operating losses, the impractical and unlikely prospects of a state subsidy, the paucity of Southeast's showing on the financial and managerial problems, and balance these against the positive and known record of Southern's past performance in nearby areas, and the inherent economic advantages of a larger carrier. Additionally, the ultimate cost to the federal government was an important element. All of these factors were properly considered by the Board and its selection of Southern was not arbitrary or unwarranted.

### (3.)

Southeast next contends that the Examiner acted arbitrarily in attaching divestiture conditions to his recommended grant to Southeast and that the Board acted arbitrarily in approving that part of the Examiner's recommendation. However, the Board's second order makes clear that a grant to Southeast would

not be warranted even if Mason and Dixon were allowed to retain control with the consequent financial benefits to Southeast.[5] The Board's finding in this respect is supported by substantial evidence which has been previously discussed and hence there is no occasion for us to reach the divestiture issue.

### (4.)

■ Southeast further asserts it was deprived of full and fair hearing in that it was unaware that Southern was a competitive applicant in the proceeding. The argument rests chiefly on Southern's failure to present specific data regarding the particular route in issue. But the record shows this choice was based on Southern's belief that the route was not economically feasible. Nevertheless, Southern's president testified that if the Board found the route economically justified, Southern would gladly serve it. Moreover, he specifically stated that Southern would be "opposed to Southeast" if the Board should decide to certify the route. Finally, Southeast's brief to the Examiner consistently treated Southern as a competitive applicant, pointing out Southeast was better qualified in all aspects of air service. Since Southeast was fairly on notice that Southern was in a competitive position for the Tennessee route, the Board could properly certify Southern. Civil Aeronautics Board v. State Airlines, 1950, 338 U.S. 572, 70 S.Ct. 379, 94 L.Ed. 353; Braniff Airways, Inc. v. Civil Aeronautics Board, 1960, 107 U.S.App.D.C. 304, 277 F.2d 334.

We have considered Southeast's other contentions and find they do not warrant further discussion. The Board relied upon evidence of record in its decision, and also relied upon matters within its special competence. Universal Camera Corp. v. National Labor Relations Board,

---

5. The Board's second order states that "even if there were no question of statutory fitness or control relationship, we would not grant Southeast's application. Denial of Southeast's application is clearly required by (1) the very limited size of the route system which Southeast would be operating, and (2) the fewer public benefits which could be expected to flow from Southeast's certification in comparison to other applicants." Southeastern Area Local Service Case, Order No. E–15168.

1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Procedural regularity was afforded.

All of the critical findings necessary for the Board's order are supported by substantial evidence and its order is therefore

Affirmed.