801 F.2d 1423
 255 U.S.App.D.C. 384
 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Norfolk Southern Corporation and North American Van Lines,
Inc., Intervenors.
Patrick W. SIMMONS, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Norfolk Southern Corporation and North American Van Lines,
Inc., Intervenors.
 Nos. 85-1397, 85-1404.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 30, 1986.
Decided Sept. 30, 1986.
 
 James van R. Springer, with whom Robert J. Higgins, Joan M. Darby, Howard N. Feldman and Kevin M. Williams, Washington, D.C., were on the brief for petitioners in No. 85-1397.
 Gordon P. MacDougall, Washington, D.C., was on the brief for petitioner in No. 85-1404.
 Lawrence H. Schecker, Atty., I.C.C., with whom Robert S. Burk, Gen. Counsel, John J. McCarthy, Jr., Deputy Associate Gen. Counsel, I.C.C., John J. Powers, III and John P. Fonte, Washington, D.C., Attys., Dept. of Justice were on the brief for respondents in Nos. 85-1397 and 85-1404.
 L. John Osborn, with whom Eugene T. Liipfert, Fritz R. Kahn, Mark J. Andrews and Thomas E. Acey, Jr., Washington, D.C., were on the brief for intervenors, Norfolk Southern Corp. and North American Van Lines, Inc., in Nos. 85-1397 and 85-1404.
 Before STARR, SILBERMAN and BUCKLEY, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STARR.
 STARR, Circuit Judge:
 
 
 1
 This case calls upon us to review the Interstate Commerce Commission's decision to approve the acquisition of North American Van Lines, Inc. by Norfolk Southern Corporation. The principal issue raised by the petitions for review is whether the ICC's decision was premised on an impermissible construction of the statutory provision which governs the acquisition, 49 U.S.C. Sec. 11344(c) (1982). For the reasons that follow, we conclude that the Commission's interpretation is violative of clear Congressional intent. We therefore grant the petitions for review.
 
 
 2
 * In August 1984, Norfolk Southern Corporation (Norfolk or NS) and North American Van Lines, Inc. (North American or NAVL) filed a joint application with the Commission seeking authority for Norfolk to acquire North American. Norfolk is a leading firm in the railway industry by virtue of its control of two large railroads, the Norfolk and Western Railway Company and the Southern Railway Company, as well as their respective subsidiaries. Norfolk's railroads operate approximately 18,000 miles of track in twenty States and Ontario, Canada.
 
 
 3
 North American, on the other hand, is one of the largest trucking firms in the United States. Its motor carrier operations are organized into three components: (1) the Household Goods Division, specializing in residential moving services; (2) the Commercial Transport Division, handling principally manufactured goods; and (3) the High Value Products Division, specializing in business relocations and transportation of high-technology apparatus. In 1983, North American's Household Goods and Commercial Transport Divisions each accounted for approximately forty percent of the company's domestic motor carrier revenues, with its High Value Products Division garnering the remaining twenty percent.
 
 
 4
 In support of their merger proposal, Norfolk and North American maintained that "acquisition of NAVL will enable NS to provide coordinated, single-system intermodal services that will produce significant benefits for shippers." Joint Appendix (J.A.) at 741. The likely benefits were said to include the opportunity for shippers to obtain a comprehensive range of services at reduced costs through a single organization, that is to say less costly "one-stop" shopping. Their application set forth substantial plans for employment of North American's Commercial Transport Division in intermodal service ventures with the Norfolk railroads. A prime example of this intermodal service was the parties' proposed joint trailer-on-flatcar (TOFC) service,[1] a form of bimodal transportation for which there appears to be increasing demand.
 
 
 5
 The applicants acknowledged that NAVL would continue to operate as a separate, autonomous entity after the merger. J.A. at 756. They also conceded that the Household Goods and High Value Products Division "in the near term will continue, for the most part, their present focus on all-motor service." J.A. at 812; see also J.A. at 108 ("Norfolk Southern recognizes that much of North American's traffic is peculiarly suited to all-truck handling."). Nevertheless, the applicants contended that "the entirety of NAVL, not just [the Commercial Transport Division]," would prove useful in Norfolk's intermodal operations. J.A. at 813. In particular, the applicants emphasized that the Household Goods and High Value Products Divisions' nationwide networks of agents and the opportunity for joint purchasing would facilitate the operation of intermodal services.
 
 
 6
 Petitioners Regular Common Carrier Conference and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America jointly opposed the application before the Commission. The only other party to object to the proposed merger was petitioner Patrick W. Simmons, Illinois Legislative Director for the United Transportation Union. Numerous organizations supported the application, including the United States Department of Transportation, several state governments and many nationwide shippers of freight.
 
 
 7
 Before the Commission, petitioners contended that Norfolk and North American had not met their burden under the three-part test for rail carriers acquisitions of motor carriers as set forth in the key provision of the pertinent statute, 49 U.S.C. Sec. 11344(c):
 
 
 8
 When a rail carrier, or a person controlled by or affiliated with a rail carrier, is an applicant and the transaction involves a motor carrier, the Commission may approve and authorize the transaction only if it finds that the transaction is consistent with the public interest, will enable the rail carrier to use motor carrier transportation to public advantage in its operations, and will not unreasonably restrain competition.
 
 
 9
 Petitioners argued principally that the proposed merger was precluded by the second of the three statutory requirements, namely that the acquired motor carrier be used by the rail carrier "to public advantage in its operations." (Emphasis added). In petitioners' view, the Commission was bound by its longstanding (and indeed original) understanding that this proviso permitted a railroad to acquire a motor carrier only for operations "auxiliary to or supplemental of" train service in the absence of "special circumstances." This entire doctrine, including both the auxiliary-supplementary rule and its exception, has come to be known over the years as the "special circumstances doctrine." Petitioners contended that the merger application should be denied because of the undisputed fact that North American would not be used as an adjunct to Norfolk's rail operations and because the latter had not demonstrated "special circumstances" warranting its acquisition of North American's motor operations.
 
 
 10
 Petitioners attacked not only the proposed merger but, in addition, challenged the Commission's recently issued policy statement, Ex Parte No. 438, Acquisition of Motor Carriers by Railroads (July 27, 1984), J.A. at 53-69, reinterpreting the pivotal statutory phrase, "in its operations." Under the Commission's new approach, that provision required only that the motor carrier be used in the acquiring rail carrier's "overall transportation operations" rather than in the latter's "rail operations." Accordingly, the ICC expressly repudiated the well-established "special circumstances" doctrine. In petitioners' view, the ICC lacked authority to adopt this latter-day, less stringent interpretation of the statute inasmuch as the traditional interpretation (that the acquired motor carrier be used in the acquiring firm's rail operations) embodied Congressional intent, not simply agency policy. As petitioners saw it, the combined effect of the legislative history of the provision, Congress' reenactment of that provision with knowledge of the Commission's "special circumstances" doctrine, and the Supreme Court's longstanding, express approval of that doctrine demonstrated Congress' intent to codify a rail operations requirement. Petitioners further argued that the ICC's underlying decision in Acquisition of Motor Carriers was impermissible because it denuded the statutory restriction of any independent significance in relation to the remainder of the three-part test.
 
 
 11
 Petitioners also maintained that the proposed merger was deficient under the other two prongs of the statutory test. In particular, they submitted evidence to the effect that the acquisition would enable Norfolk to shift costs and revenues between its regulated rail operations and its unregulated motor carrier operations. According to petitioners, Norfolk could thereby evade rail rate regulation and cross-subsidize North American's motor carrier operations to the detriment of competitors in the latter field. Finally, petitioners argued that the merger was unnecessary to realize the efficiencies of intermodal operations because the same efficiencies could be achieved through the two firms' collaboration as separate companies.[2]
 
 
 12
 In the face of this assault, Norfolk and North American offered two alternative responses to the objection that the proposed acquisition contravened the statute's "in its operations" requirement. First, they stoutly defended the Commission's reinterpretation of that requirement in its Acquisition of Motor Carriers decision and contended that "the proposed transaction will be useful to the overall operations of NS in transportation generally," as required under the Commission's new doctrine. J.A. at 813. Second, the applicants argued that, even under the Commission's original construction of the statute, the transaction should pass muster because, in their view, the record warranted a finding of "special circumstances" under established precedent. In particular, they stressed that existing independent motor carriers had failed to provide shippers with coordinated intermodal services on a regular basis despite the public need for such services. See J.A. at 828-33.
 
 
 13
 In May 1985, the ICC approved the application without restriction. In rejecting petitioners' challenge based upon the "in its operations" requirement, the Commission applied for the first time its Acquisition of Motor Carriers decision reinterpreting that requirement and jettisoning the "special circumstances" doctrine. The Commission dismissed petitioners' contention that the agency's newly fashioned interpretation contravened Congress' intent as having been "addressed and rejected" in the ICC's earlier policy statement. J.A. at 23. The ICC also deemed meritless the objection that the Commission's reinterpretation of the statute rendered surplusage the second prong of the governing statutory test. According to the Commission, its new construction would still give effect to Congress' original intent to prohibit acquisitions "in which the acquirer purchases the assets intending ultimately to withdraw them from the market." J.A. at 24.
 
 
 14
 The ICC expressly refused to rely on applicants' contention that their merger satisfied the traditional "special circumstances" doctrine. Instead, the Commission suggested briefly, by way of a footnote, two other possible bases for approving the acquisition. J.A. at 25 n. 17. First, the Commission observed that one of North American's Divisions (Commercial Transport) would in fact be employed in Norfolk's rail operations. Second, the Commission asserted that the acquisition would satisfy the "special circumstances" doctrine if that doctrine were modified to reflect current national transportation policy.
 
 II
 
 15
 In reviewing petitioners' various challenges, we find it necessary to address only the question whether the ICC exceeded its statutory authority by construing 49 U.S.C. Sec. 11344(c) to permit rail-motor consolidations without regard to whether the motor carrier's operations will be useful in the acquiring firm's rail operations. In considering that issue of statutory construction, our analysis is guided by the familiar two-step framework set forth in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, if resort to traditional tools of statutory interpretation reveals that the Article I branch had a clear intent on the precise question at issue, "that intention is the law and must be given effect." Id. at 843 n. 9, 104 S.Ct. at 2782 n. 9. Second, if Congress did not actually have an intent with respect to the specific question, then the Article III branch is obliged to defer to a reasonable interpretation advanced by the agency which Congress charged in the first instance with the task of administering the statute. Id. at 843-45, 104 S.Ct. at 2782-83.
 
 
 16
 The fundamental source for ascertaining Congressional intent is, of course, the statutory language which Congress chose to employ. It is, as we have said time and again, the statute's language which Congress enacted, not speeches or debates or reports crafted by assistants and advisers to those whom the people elected. See, e.g., Abourezk v. Reagan, 785 F.2d 1043, 1054 n. 11 (D.C.Cir.1986); Hirschey v. FERC, 777 F.2d 1, 7-8 & n. 1 (D.C.Cir.1985) (Scalia, J., concurring). In this instance, the pertinent statute, as we related in our earlier discussion, contains a proviso setting forth three restrictions on the Commission's authority to approve rail carrier acquisitions of motor carriers. The first and third requirements of the proviso are expressed as broad and rather imprecise standards: the "transaction [must be] consistent with the public interest" and must "not unreasonably restrain competition." The very breadth of these standards suggests Congress' intent to confer upon the ICC broad authority to fill in the gaps inevitably created by such imprecise benchmarks. See Chevron, 467 U.S. at 843-44, 104 S.Ct. at 2782-83. The Commission's interpretation of those restrictions must, in consequence, be upheld as long as that interpretation "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute." Id. at 845, 104 S.Ct. at 2783. (citations omitted).
 
 
 17
 In contrast, the remaining restriction (or test) set forth in the proviso represents a more precise limitation on the Commission's authority. See United States v. Rock Island Co., 340 U.S. 419, 428, 71 S.Ct. 382, 388, 95 L.Ed. 391 (1951) (noting that the proviso has a "clause requiring special justification for railroads to receive motor-carrier operating rights"). The proposed acquisition must not only be in the public interest and not unreasonably restrain competition, but it must also "enable the rail carrier to use motor carrier transportation to public advantage in its operations." 49 U.S.C. Sec. 11344(c) (emphasis added); see American Trucking Associations, Inc. v. United States, 364 U.S. 1, 9, 80 S.Ct. 1570, 1575-76, 4 L.Ed.2d 1527 (1960) (ATA II ) (identical emphasis accorded statutory language in construing Congressional "mandate" underlying earlier codification of proviso). Since the phrase "in its operations" clearly relates back to the antecedent, "rail carrier," the plain meaning of this statutory restriction is to require that the acquired motor carrier be used in the rail carrier's operations. Assuming, as we must, that the term "in its operations" was intended to have independent "restrictive significance," see, e.g., Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979), the phrase cannot properly be interpreted to mean in the rail carrier's overall operations. Otherwise, the requirement of "in its operations" would be rendered tautologous: by definition a motor carrier will be used, if at all, by an acquiring rail carrier in its overall transportation activities or operations. Thus, it seems to us that the only reasonable construction of this phrase is that Congress intended for rail carriers to be allowed to acquire only motor carriers that would be useful in rail operations. See ATA II, 364 U.S. at 9, 80 S.Ct. at 1575, 1576 (mandate of proviso is to prohibit acquisitions where "the motor transportation is essentially unrelated to rail service").
 
 
 18
 In its Acquisition of Motor Carriers decision, however, the ICC rejected this straightforward analysis. According to the Commission, it was the agency, not Congress, that "added the word 'rail' to the statute that had only provided that the rail carrier use the to-be-acquired motor carrier 'to public advantage in its operations.' See 49 U.S.C. Sec. 11344(c)." J.A. at 57; see also id. at 64. But contrary to the Commission's approach, we cannot properly ascertain Congress' intent in employing a particular statutory phrase without considering the relationship of that phrase to the rest of the pertinent statutory language. And as we observed above, the phrase "in its operations" makes no sense in the context of the clause in which it appears unless the phrase is construed to mean rail operations.
 
 
 19
 Even if the phrase, "in its operations," were ambiguous when considered as part of the second restriction alone, its meaning cannot reasonably be disputed when considered in relation to the rest of the proviso. In particular, we are persuaded that construing "in its operations" to mean overall transportation operations of the acquiring carrier renders the second restriction redundant of the general public interest restriction. That is not, it seems to us, an appropriate way of reading statutes. See generally 2A Sutherland, Statutes and Statutory Construction Sec. 46.06 (C. Sands rev. 4th ed. 1984). Since the purchase of a motor carrier will always enable a rail carrier "to use motor carrier transportation ... in its [overall transportation] operations," the only possible limitation contained in the second restriction as reinterpreted by the Commission is that the motor carrier transportation must be used to "public advantage." But its use will always be to public advantage if the preceding statutory requirement of "consisten[cy] with public interest" has been found satisfied.[3] On the other hand, a general public interest finding will not automatically compel a finding that the motor carrier will be used to public advantage in rail operations. On the basis of the statutory proviso as a whole, we therefore conclude that Congress intended to impose a general requirement that rail carriers be prohibited from acquiring motor carriers except when used to improve rail operations.
 
 
 20
 The legislative history of the provision's original enactment strongly supports our reading of the statute's plain language.[4] It was first enacted as part of Sec. 213(a) of the Motor Carrier Act of 1935, ch. 498, 49 Stat. 543, 556. Joseph Eastman, then the Federal Coordinator of Transportation, drafted the bill that eventually resulted in that statute. Mr. Eastman was an architect of the Act pursuant to his statutory responsibility under Section 13 of the Emergency Railroad Transportation Act of 1933, ch. 91, 48 Stat. 211. He also played an active role in shepherding the bill through the legislative process. 79 Cong.Rec. 5651 (1935). The Supreme Court has recognized, see Rock Island, 340 U.S. at 431 n. 9, 71 S.Ct. at 389-90 n. 9, that Mr. Eastman's testimony before Congress in 1938 regarding the meaning of the provision represents a probative piece of legislative history. In his testimony, Mr. Eastman explained as follows:
 
 
 21
 The reason for that proviso was that at the time when this act was under consideration by your committee, there was a feeling on the part of many that railroads, for example, ought not be permitted to acquire motor carriers at all. It was pointed out, in opposition to that view, that there were many cases where railroads could use motor vehicles to great advantage in their operations, in substitution for rail service, as many of them are now doing. Many railroad men, for example, feel that the operation of way trains has become obsolete; that the motor vehicle can handle such traffic between small stations much more economically and conveniently than can be done by a way train; and the motor vehicles are being used in that way by many railroads. The same is true of many terminal operations. The motor vehicle is a much more flexible unit than a locomotive switching car, and can be used to great advantage and with great economy in many railroad operations.
 
 
 22
 Hearings before a Subcommittee of the Senate Committee on Interstate Commerce on S. 3606, 75th Cong., 3d Sess. 23 (1938). See also Amending Motor Carrier Act: Hearings on H.R. 9739 before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 75th Cong., 3d Sess. 19-20 (1938); 79 Cong.Rec. 5655 (statement of Senator Wheeler).
 
 
 23
 The legislative history of the proviso's reenactment in 1940 reinforces our reading of the statute. Prior to 1940, the ICC had decided numerous cases requiring it to interpret the new provision. The Commission uniformly held that the statutory language evinced Congressional intent that railroads should not be given "free opportunity to go into the kind of truck service which is strictly competitive with, rather than auxiliary to, their rail operation." Pennsylvania Truck Lines, Inc.-Control-Barker, 1 M.C.C. 101, 111-12 (1936). Indeed, the ICC routinely restricted rail carrier acquisitions to motor carrier service that was "auxiliary and supplemental to" rail service. Id. at 113. This administrative practice had been expressly called to Congress' attention before it reenacted Sec. 213 of the Motor Carrier Act as Sec. 5(2) of the Transportation Act of 1940, ch. 722, 54 Stat. 898. See ATA II, 364 U.S. at 7, 80 S.Ct. at 1574; Rock Island, 340 U.S. at 432 & n. 10, 71 S.Ct. at 390 n. 10. Congress' failure to disturb the agency's well-settled interpretation of "in its operations" provides "persuasive evidence that the interpretation is the one intended by Congress." NLRB v. Bell Aerospace Co., 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974) (footnote omitted); see also Young v. Community Nutrition Institute, --- U.S. ---, 106 S.Ct. 2360, 2366, 90 L.Ed.2d 959 (1986).
 
 
 24
 There is more. In 1978, the proviso in Sec. 5(2)(b) of the 1940 Act (which we have just described) was codified at 49 U.S.C. Sec. 11344(c). Two years later, Congress substantially amended the statutory scheme governing the regulation of the railroad and trucking industries in order to foster competition and intermodalism and to decrease regulation. See Motor Carrier Act of 1980, Pub.L. No. 96-296, 94 Stat. 793; Staggers Rail Act of 1980, Pub.L. No. 96-448, 94 Stat. 1895. "[W]hen Congress carefully reexamined this area of the law in 1980," Square D Co. v. Niagara Frontier Tariff Bureau, Inc., --- U.S. ---, 106 S.Ct. 1922, 1928, 90 L.Ed.2d 413 (1986), however, it did not see fit to change this provision despite testimony specifically urging it do so, see Railroad Deregulation Act of 1979: Hearings on S.796 Before the Subcommittee on Surface Transportation of the Senate Committee on Commerce, Science, and Transportation, 96th Cong., 1st Sess. 221, 223-24 (Part 1, 1979) (Statement of Walter Treanor, The Western Pacific Railroad Company).
 
 
 25
 In the face of this monolith of recent history, the Commission has failed to identify any specific statutory provision or reliable piece of legislative history indicating a specific Congressional intent to overturn the longstanding rail operations requirement. Cf. Square D., 106 S.Ct. at 1928. Nevertheless, in its Acquisition of Motor Carriers decision, the ICC maintained that its reinterpretation of the provision was justified and perhaps compelled by Congress' new emphasis on competition and intermodalism in the 1980 enactments. See J.A. at 64-67.
 
 
 26
 We are unpersuaded. To be sure, when the ICC resolves statutory issues left unresolved by Congress, such as the meaning of the "public interest" or the "public convenience," it is the agency's province to strike a reasonable balance between competing statutory policies. See Chevron, 467 U.S. at 864-66, 104 S.Ct. at 2792, 2794. In discharging this delegated function, the ICC is obliged to consider the general purposes underlying the statutory scheme as a whole. See, e.g., American Trucking Associations, Inc. v. United States, 355 U.S. 141, 151-52, 78 S.Ct. 165, 171, 2 L.Ed.2d 158 (1957) (ATA I ). But it will not do for an agency to invoke the broad purposes of an entire act in order to contravene Congress' intent embodied in a specific provision of the statute. See Board of Governors v. Dimension Financial Corp., --- U.S. ---, 106 S.Ct. 681, 688-89, 88 L.Ed.2d 691 (1986); cf. Square D, 106 S.Ct. at 1928-29. Acts of Congress may well have a unifying theme and central thrust, but the felt necessities of the legislation process inevitably produce more narrowly focused provisions which fail in full rigor to effectuate the overarching goal. And the hard fact remains that it is not the judiciary's assigned task to sit as a modernday Council of Revision overseeing the administrative state and to cy pres statutory provisions that may not be in full keeping with the spirit that has more recently animated Congress. As in other areas, we must bear firmly in mind "the proper--and properly limited--role of the courts in a democratic society." See Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).
 
 
 27
 It may well be that, in the contemporary marketplace, the "in its operations" requirement is anachronistic. We may further assume that the requirement constitutes unsound economic policy. But it is not for us to strike down under guise of interpretation that which Congress has seen fit to erect and retain, even if the policy embodied in the provision is in fact unsound or unwise. Cf. Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 505, 102 S.Ct. 1186, 1196, 1197, 71 L.Ed.2d 362 (1982); Ferguson v. Skrupa, 372 U.S. 726, 728-30, 83 S.Ct. 1028, 1030, 1031, 10 L.Ed.2d 93 (1963). Mindful of Dr. Johnson's observation that we oftimes stand more in need of being reminded than we do of education, we remember that in our system of government it is Congress, not the Commission or the courts, which enjoys authority to repeal a statutory restriction. See Dimension Financial, 106 S.Ct. at 689; cf. American Trucking Associations v. ICC, 722 F.2d 1243 (5th Cir.) (ICC has authority to abolish "special circumstances" doctrine as applied to licensing cases in absence of express statutory requirement), cert. denied, 460 U.S. 1022, 75 L.Ed.2d 493, 105 S.Ct. 324 (1984); 49 U.S.C. Sec. 10505(g) (1982) (ICC's newly granted authority to exempt rail carrier transportation does not permit it "to authorize intermodal ownership that is otherwise prohibited by this title").
 
 
 28
 We hasten to add that our conclusion by no means divests the ICC of all latitude in applying this historic limitation which the Commission believes has outlived its usefulness. We hold only that the Commission exceeded its statutory authority in relying on the premise that it "has carte blanche discretion to ignore," Japan Whaling Association v. American Cetacean Society, --- U.S. ---, 106 S.Ct. 2860, 2867, 92 L.Ed.2d 166 (1986), whether rail-motor carrier consolidations will employ motor transportation to public advantage in rail operations. As the Supreme Court has stated, "[t]he words 'auxiliary to or supplemental of' are not taken from the Act," Rock Island, 340 U.S. at 437, 71 S.Ct. at 395, 396 (footnote omitted), nor is the meaning of that phrase "limited to the Commission's practice at any particular time," id. at 443, 71 S.Ct. at 395, 396. While we are persuaded that a requirement that rail-acquired motor carriers "act in coordination with train service" has been laid down by Congress, the Commission is indisputably empowered to interpret and apply that requirement in light of changed circumstances. Id. at 443, 71 S.Ct. at 395, 396.
 
 
 29
 Our holding today thus leaves open the question whether the ICC could properly determine, in the exercise of discretion informed by its undoubted expertise, that the use of motor carrier transportation in essentially bimodal operations (such as TOFC) satisfies the statute's "in its operations" requirement. We need not decide, however, to what extent, if any, the consolidation of Norfolk and North American could be approved on the basis of such an analysis.[5]
 
 
 30
 Our decision also leaves intact the Commission's well-established practice of excepting rail-motor consolidations from the rail-related operations requirement on the basis of "special circumstances." See, e.g., American Trucking Associations, Inc. v. United States, 425 F.Supp. 903 (D.D.C.1975), aff'd mem., 425 U.S. 955, 96 S.Ct. 1735, 48 L.Ed.2d 201 (1976). As the Commission explained in its decision, the exception has traditionally been applied when "(1) unrestricted service would not result in the undue restraint of competition, and (2) the public interest requires the proposed operation, which independent motor carriers have not furnished, except where it suited their convenience." J.A. at 25 n. 17. We are mindful in this regard of Norfolk and North American's suggestion that we uphold the Commission's action because various of the ICC's findings of fact would indeed support approval of the merger on the basis of "special circumstances," as traditionally defined. But the obvious (and fatal) difficulty with this argument is that the Commission expressly refused to premise its action upon such an analysis. See ATA II, 364 U.S. at 13-14, 80 S.Ct. at 1577, 1578 (quoting SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 459 (1943) ).
 
 
 31
 Rather, the ICC hypothesized that "if we were to recast the second factor to reflect current national transportation policy we might instead ask: Does the proposal create an environment where innovation and new services responsive to the needs of shippers would occur? Based on our analysis of this record ... this question clearly would be answered in the affirmative." J.A. at 26 n. 17. As redefined by the ICC, the "special circumstances" exception would seem to apply whenever the transaction would further "current national transportation policy." We are satisfied, however, that the Commission is wanting in statutory authority to define the exception so broadly. Cf. ATA I, 355 U.S. at 152, 78 S.Ct. at 171, 172 (suggesting that the ICC may not use the "special circumstances" exception to evade express statutory restrictions). The new exception would eviscerate the rail operations requirement to the same extent as the Commission's outright abolition of the principle through the vehicle of statutory reinterpretation, an avenue which we have decided (for the reasons already stated) cannot be countenanced. The Commission implicitly recognized the substantial equivalency of the two approaches by relying upon the same analysis for both. At all events, it is beyond peradventure that we are confronted with an exercise of the ICC's discretion on the edge of its statutory authority concerning a transaction of great size and importance. Under those circumstances, we cannot in conscience affirm the agency's decision on the basis of a terse and speculative finding contained in a modest footnote. See Celcom Communications Corp. v. FCC, 789 F.2d 67, 70-71 (D.C.Cir.1986).
 
 
 32
 The petitions for review are therefore granted and the case remanded to the Commission so that it can reconsider the proposed transaction in light of the clear Congressional intent informing the applicable statutory provision.[6]
 
 
 33
 It is so ordered.
 
 
 
 [1]
 Under this transportation mode, freight is shipped by truck trailers that, during part of the trip, are carried piggy-back on railroad flatcars
 
 
 [2]
 In addition, petitioner Simmons contended that if the merger were approved, then labor protective conditions under 49 U.S.C. Sec. 11347 (1982) should be imposed for all affected railroad employees, including non-Norfolk rail employees
 
 
 [3]
 The ICC's response to the surplusage problem will not withstand analysis. According to the Commission, its interpretation of the provision preserves Congress' original intent to bar railroads from acquiring a motor carrier with the purpose of shutting down the motor carrier and selling off its assets. J.A. at 24. This interpretation, however, was advanced without a shred of support or with the slightest indication that Congress would choose to express that narrow, specific prohibition in this sort of roundabout, obscure fashion. Moreover, the ICC failed to explain why such an acquisition would, at any rate, not be precluded by the "public interest" requirement, thereby leaving the surplusage problem unanswered and, we believe, unanswerable
 
 
 [4]
 We are therefore fortified in our discernment of Congress' intent, which is of course the overarching goal of our inquiry. See, e.g., Young v. Community Nutrition Inst., --- U.S. ---, 106 S.Ct. 2360, 2364, 90 L.Ed.2d 959 (1986); Chevron U.S.A. Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694. We should observe, however, that in our view the language and structure of the statutory provision clearly yield the requirement that motor carrier transportation be used in the acquiring company's rail operations. As a unanimous Supreme Court has instructed us, when language is clear and plain, language controls. Board of Governors v. Dimension Fin. Corp., --- U.S. ---, 106 S.Ct. 681, 688-89, 88 L.Ed.2d 691 (1986). But we are also mindful that what may seem clear, or at least the most natural reading of a statute, may nonetheless be viewed as unclear or ambiguous. See Young v. Community Nutrition Inst., supra, --- U.S. ---, 106 S.Ct. at 2364-65, 90 L.Ed.2d 959. Thus it is with reluctance that we embark into the ever uncertain precincts of legislative history. See, e.g., Abourezk v. Reagan, supra, 785 F.2d at 1054-55 & n. 11; Hirschey v. FERC, supra, 777 F.2d at 7-8 & n. 1 (Scalia, J., concurring); Eagle-Picher Indus. v. EPA, 759 F.2d 922, 929 n. 11 (D.C.Cir.1985). Our doing so is arguably justified in these specific circumstances by the clear weight of authoritative precedent, in that the Supreme Court itself, as we indicate in the text, has examined in detail the legislative history of this provision
 
 
 [5]
 The Commission observed in passing that "[t]he motor operations of the [Commercial Transport] Division clearly will be used to public advantage by NS in its rail operations," J.A. at 25 n. 17, but it did not seek to justify its approval of the entire transaction on that ground alone. Rather, in both its decision and before this court the ICC relied on the finding of "special circumstances" as the alternative basis for its decision
 
 
 [6]
 Our disposition favorably to petitioners does not extend, however, to Mr. Simmons' contention under 49 U.S.C. Sec. 11347. See supra n. 2. The settled law of this circuit forecloses his argument and disposes with any need on our part for elaboration. See Southern Pac. Transp. Co. v. ICC, 736 F.2d 708, 724 (D.C.Cir.1984), cert. denied, sub. nom., Kansas City Railway Co. v. U.S., 469 U.S. 1208, 105 S.Ct. 1171, 84 L.Ed.2d 322 (1985); Lamoille Valley R.R. Co. v. ICC, 711 F.2d 295, 323-24 (D.C.Cir.1983)