818 F.2d 87
 260 U.S.App.D.C. 221
 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Norfolk Southern Corporation and North American Van Lines,
Inc., Intervenors.
Patrick W. SIMMONS, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Norfolk Southern Corporation and North American Van Lines,
Inc., Intervenors.
 Nos. 85-1397, 85-1404.
 United States Court of Appeals,
District of Columbia Circuit.
 May 8, 1987.
 
 Petitions for Review of Orders of the Interstate Commerce commission.
 Eugene T. Liipfert, Fritz R. Kahn, L. John Osborn, Mark J. Andrews and Thomas E. Acey, Jr., Washington, D.C., were on intervenor's, Norfolk Southern Corporation's, petition for rehearing.
 Robert S. Burk, General Counsel, John J. McCarthy, Jr., Deputy Associate General, Laurence H. Schecker, Atty., I.C.C., John J. Powers, III and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on respondents' joint petition for rehearing.
 Robert J. Higgins, James vanR. Springer, Joan M. Darby and Kevin M. Williams, Washington, D.C., were on petitioners' response to petitions for rehearing.
 Before STARR, SILBERMAN and BUCKLEY, Circuit Judges.
 Opinion PER CURIAM.
 
 ON PETITIONS FOR REHEARING
 PER CURIAM:
 
 1
 We have before us petitions for rehearing from our decision in International Brotherhood of Teamsters v. ICC, 801 F.2d 1423 (D.C.Cir.1986). In that opinion, we reviewed challenges to the ICC's decision to approve the acquisition of North American Van Lines, Inc. ("NAVL"), a motor carrier, by Norfolk Southern Corporation ("NS"), a rail carrier. We now hold that legislation enacted in the wake of our decision has mooted one part of petitioners' two-pronged attack on the Commission's approval of the transaction.[1] Upon consideration of the remaining challenge, we conclude that the Commission acted properly within its discretion in approving the NS/NAVL transaction and therefore deny the petitions for review.
 
 
 2
 * This controversy revolves around the Commission's interpretation and application of 49 U.S.C. Sec. 11344(c) (1982), which governs rail carriers' acquisitions of motor carriers. The pertinent portion of this statute sets forth a three-part test for ICC approval of such transactions. The Commission may authorize a proposed acquisition
 
 
 3
 only if it finds that the transaction is consistent with the public interest, will enable the rail carrier to use motor carrier transportation to public advantage in its operations, and will not unreasonably restrain competition.
 
 
 4
 Id.
 
 
 5
 Our prior opinion addressed principally the Commission's interpretation of the second requirement. It was the Commission's view that this part of the statutory test required only that the motor carrier be used in the acquiring rail carrier's overall transportation operations, rather than in the rail carrier's rail operations.[2] The Commission first adopted this view, which represented a departure from longstanding agency precedent, in a policy statement, Ex Parte No. 438, Acquisition of Motor Carriers by Railroads, 1 I.C.C.2d 716 (1984), Joint Appendix ("J.A.") at 53, and first applied it in approving the NS/NAVL acquisition, Norfolk Southern Corp.--Control--North American Van Lines, Inc., ICC Fin. No. 30500 (Apr. 30, 1985) [hereinafter Commission Decision ], J.A. at 3. In our earlier decision, we concluded that the ICC's latter-day interpretation conflicted with the language and structure of section 11344(c). Teamsters v. ICC, 801 F.2d at 1427-28. We also found that the legislative history of section 11344(c) and its predecessors strongly evinced Congressional intent to limit railroad acquisitions of motor carriers to those in which the latter would only serve to enhance the rail operations of the former. Id. at 1428-29. We therefore rejected petitioners' invitation to overlook the unequivocal import of the statutory language, as buttressed by the legislative history, and to base our conclusion instead on the new competitive circumstances of the transportation industry:
 
 
 6
 It may well be that, in the contemporary marketplace, the "in its operations" requirement is anachronistic. We may further assume that the requirement constitutes unsound economic policy. But it is not for us to strike down under guise of interpretation that which Congress has seen fit to erect and maintain.... [I]n our system of government it is Congress, not the Commission or the courts, which enjoys authority to repeal a statutory restriction.
 
 
 7
 Id. at 1430 (citations omitted).
 
 
 8
 Following our decision, Congress promptly took action on the matter. Without repealing or amending the provision in question, Congress enacted highly specific legislation that, among other things, unambiguously directs this court in reviewing ICC approval of the NS/NAVL transaction to accept the ICC's interpretation of the "in its operations" language of section 11344(c). Anti-Drug Abuse Act of 1986, Pub.L. No. 99-570, Sec. 3403, 49 U.S.C.A. Sec. 11344 Note, at 521 (1987).[3] In the face of this legislation, petitioners no longer dispute that the Commission's interpretation of the relevant statutory language governs our review of the ICC's decision. That portion of their challenge is, therefore, rendered moot by the legislation.
 
 
 9
 Nonethless, a lively controversy rages on in this case, unresolved by Congress' action.[4] Specifically, petitioners pursue their attack on the Commission's application of the third prong of section 11344(c), which requires the ICC in approving an acquisition to find that it "will not unreasonably restrain competition." Invoking the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A) (1982), petitioners charge that the ICC acted arbitrarily and capriciously in failing adequately to consider (and indeed rejecting) evidence that the acquisition would enable NS to shift costs and revenues between the regulated rail portion and the unregulated motor portion of the proposed joint rail-motor operations. Through such shifting, petitioners argue, NS could evade rail rate regulation and cross-subsidize NAVL motor carrier operations, thereby injuring NAVL's competitors in the motor carrier industry. It is to that argument we now turn, mindful that a reviewing court owes considerable deference to Commission determinations under section 11344(c). Cf. Southern Pacific Transportation Co. v. ICC, 736 F.2d 708, 714, 716-17 (D.C.Cir.1984) (reviewing Commission approval of railroad's acquisition of other railroads), cert. denied, 469 U.S. 1208, 105 S.Ct. 1172, 84 L.Ed.2d 322 (1985).
 
 II
 
 10
 At the outset, we note that petitioners' challenge centers on a narrow part of the Commission's analysis of competition. In a lengthy, careful discussion, the ICC broadly considered "whether the proposed transaction would create or enhance the ability of NS and NAVL to maintain rates above competitive levels, or to reduce or eliminate non-price competition, in relevant transportation markets." Commission Decision at 25, J.A. at 27. It separately assessed the horizontal, vertical, and conglomerate effects of the NS/NAVL consolidation. Id. Petitioners attack only the Commission's evaluation of the vertical competitive effects, which are "those arising between companies in a supplier-customer relationship." Id.[5]
 
 
 11
 Before focusing on the narrow ground of petitioners' attack, we pause briefly to describe the pertinent features of the regulatory landscape. The ICC has jurisdiction to determine the maximum level of rail rates only where "a rail carrier has market dominance over the transportation to which a particular rate applies." 49 U.S.C. Sec. 10701a(b)(1) (1982); see also id. Sec. 10709(c); Commission Decision at 29 n. 29, J.A. at 31 n. 29. For purposes of determining the Commission's authority, Congress has defined "market dominance" as "an absence of effective competition from other carriers or modes of transportation for the transportation to which a rate applies." 49 U.S.C. Sec. 10709(a). In addition to this general definition, the Commission is directed by statute not to find market dominance as to a particular rate if the ratio of revenue-to-variable cost on a shipment to which the rate applies is 180% or less. See id. Sec. 10709(d); Commission Decision at 29 n. 29, J.A. at 31 n. 29. See generally General Chemical Corp. v. ICC, 817 F.2d 844, 846-47 (D.C.Cir.1987). From this statutory framework, it is clear that one critical element of establishing NS/NAVL's capacity to evade rate regulation is determining where, if at all, its rates can be regulated.
 
 
 12
 To determine maximum rail rates for transportation of market dominant traffic, the Commission has fashioned four upward cost constraints. See Commission Decision at 31 & n. 32, J.A. at 33 & n. 32. Petitioners' argument that the NS/NAVL consolidation will permit rate regulation evasion principally concerns two of these constraints. See Petitioners' Brief at 54. Under the first constraint, a rail carrier's rates cannot "be designed to earn greater revenues than needed to achieve and maintain ... 'revenue adequacy.' " Id. at 55 (quoting Coal Rate Guidelines-Nationwide, 1 I.C.C.2d 520 (1985), aff'd sub nom. Consolidated Rail Corp. v. United States, 812 F.2d 1444 (3d Cir.1987). The Commission defines "revenue adequacy" as "a rate of return on net investment equal to the current cost of capital." Commission Decision at 31 n. 32, JA. at 33 n. 32. Once a rail carrier achieves revenue adequacy, the Commission subjects its rates to closer scrutiny. Id.; see also Standards for Railroad Revenue Adequacy, 364 I.C.C. 803, 807, 809-10 (1981) ("[C]arriers are denied additional rate flexibility if they are deemed revenue adequate."), aff'd sub nom. Bessemer & Lake Erie Railroad Co. v. ICC, 691 F.2d 1104 (3d Cir.1982), cert. denied, 462 U.S. 1110, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983).
 
 
 13
 Second, regardless whether a railroad has attained revenue adequacy, its rates may not exceed the "stand-alone" cost of service. The Commission has formulated guidelines for calculating the cost of a means of delivery specially tailored to the shipper's needs, id. at 33 (citing Guidelines ), J.A. at 35, and under this second limitation, a railroad may not set rates above the level necessary "to acquire and run an efficient means of delivery for the particular benefit of the complaining shipper and any other appropriate shippers." Id. The stand-alone cost constraint is premised on the principle that captive shippers (i.e., those who ship on routes over which a railroad exercises "market dominance," see Commission Decision at 31 n. 32, J.A. at 33 n. 32) should not pay "for costs of rail facilities, or ... motor facilities disguised as rail facilities, that do not serve their rail transportation needs." Id. at 33, J.A. at 35.
 
 
 14
 Petitioners argued before the Commission that the acquisition would have anticompetitive vertical effects, relying on the theory that "a vertical merger, under certain conditions, can enable a regulated monopolist successfully to evade rate regulation and to use the excessive profits exacted from its captive customers to cross-subsidize predatory conduct in its affiliate's unregulated market." Commission Decision at 29 n. 28 (citing United States v. American Telephone & Telegraph Co., 524 F.Supp. 1336 (D.D.C.1981), later opinion, 552 F.Supp. 131 (D.D.C.1982), aff'd sub nom. Maryland v. United States, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983)), J.A. at 31 n. 28. Petitioners invoked this theory to maintain that Norfolk could avoid both revenue adequacy and stand-alone cost restraints by shifting costs and revenues between the rail and motor portions of joint operations.[6] In particular, the argument went, Norfolk could transfer revenues from the regulated rail portion of joint operations to the motor portion, thereby lowering apparent rail revenues; in addition, NS could attribute to the regulated rail portion of joint operations costs properly attributable to the motor carrier portion, thereby raising the apparent costs of providing rail service. Through such accounting legerdemain, petitioners claimed, Norfolk could present itself as revenue inadequate even if it were not. Similarly, Norfolk could artificially elevate the stand-alone cost ceiling by attributing to NS (the rail portion) costs incurred by the NAVL component (the motor portion) of joint movements, making it appear that what rail shippers paid was less than the stand-alone cost.
 
 
 15
 To demonstrate the impact of rate evasion, petitioners as a threshold matter needed to establish where NS/NAVL was in fact subject to regulation, i.e., where it was market dominant and where the statutorily prescribed revenue-to-variable cost ratio was exceeded. They depended for this showing almost exclusively on the testimony of an economic expert, who sought to show that Norfolk had market power over a large amount of rail traffic in a large number of markets and thus was in a position to engage in significant evasion of rate regulation.[7] See Petitioners' Brief at 57; see also Verified Statement of Barry C. Harris at 2, 24, J.A. at 605, 609, 635. On this basis, petitioners' expert speculated that significant cost and revenue shifting would take place, thereby unfairly underpricing NAVL's competitors in the trucking industry and exacting unreasonably high charges from captive rail shippers. See Commission Decision at 28-29, J.A. at 30-31.
 
 
 16
 The Commission determined that the foundation for petitioners' elaborate theory of rate evasion was deficient insofar as petitioners' economist calculated only where Norfolk exercised market power. This was of limited help in determining Norfolk's ability to avoid rate regulation, the Commission explained, because, as we have seen, the ICC's jurisdiction to regulate rates is not founded upon "market power," a concept of less precise dimensions and application than the threshold jurisdictional inquiry relevant here. The latter exercise requires two separate determinations that have been crafted by Congress to apply in specific contexts: first, that rates charged result in a revenue-to-variable cost ratio that exceeds 180%, 49 U.S.C. Sec. 10709(d); and second, that there is an "absence of effective competition from other carriers or modes of transportation for the transportation to which a rate applies," id. Sec. 10709(a). Petitioners do not quarrel with the fact that proving where NS had market power is not equivalent to showing the extent to which NS was subject to rate regulation. Nor do they satisfactorily explain why they made no effort to identify the routes where the two jurisdictional determinations were satisfied. Since petitioners' rate-evasion theory admittedly hinged on showing where NS was subject to ICC regulation, the Commission reasonably concluded that the expert testimony merited little probative weight.[8] In the absence of a demonstration that the Commission's criticism of petitioners' expert's study was improper, we are in no position to overturn the agency's judgment in this respect. Cf. Western Union International, Inc. v. FCC, 804 F.2d 1280, 1291 (D.C.Cir.1986).
 
 
 17
 In any event, the Commission went on to consider and reject petitioners' theory, assuming arguendo the proposition for which their expert's testimony was offered, namely, that Norfolk was subject to regulation over considerable rail traffic in numerous markets. See Commission Decision at 30-34, J.A. at 32-36. First, the Commission found that Norfolk would have no incentive improperly to transfer funds for the straightforward reason that such transfers would have almost no effect on revenue adequacy or stand-alone costs. The ICC began with unrebutted testimony that projected additional annual gross revenues for NS/NAVL service, such as trailer-on-flatcar (TOFC) service, see supra note 6, at $35-$38 million. Id. at 31, J.A. at 33. Assuming one-half of this revenue was properly attributable to NS (the rail portion of joint movements), only about $6 million of net revenues would be improperly shifted to NAVL (the motor portion of joint movements) under petitioners' own theory.[9] This would reduce Norfolk's rate of return by only 0.1 percent, and so be virtually useless as a means of disguising revenue adequacy. Id. at 31-32, J.A. at 33-34.
 
 
 18
 The Commission also determined that stand-alone cost constraints could not effectively be evaded. In addition to Norfolk's ability to shift only a fraction of its revenues from NS to NAVL, its opportunity to shift costs from trucking operations to rail operations would be curtailed by accounting guidelines and methodologies designed to prevent such abuses. Id. at 32-33, J.A. at 34-35. Moreover, the Commission noted, service in the trucking industry is inherently homogeneous enough to permit reliable trucking cost information to be developed should rail shippers suspect an inflated stand-alone cost. Id. What is more, the ICC observed, petitioners had failed "to explain why the marketplace (notably the stock market) would tolerate increased rail losses." Id. at 33, J.A. at 35. Finally, the Commission took express note of "the intense competition of the trucking industry," a thriving marketplace enlivened by "reduced regulatory barriers and modest entry costs." Id. This feature of the trucking industry, in the Commission's view, precluded any significant possibility that NS/NAVL would, by shifting costs to the rail portion, engage in predatory practices to eliminate motor competition. Id.
 
 
 19
 Petitioners broadly attack the Commission's calculation of the de minimis impact of improper revenue shifting. First, they contend that the Commission should have considered future revenue beyond that generated in the first year following the merger. Petitioners' Brief at 65. This argument fails, however, by virtue of the fact that petitioners made no effort to calculate long-term revenue or even suggested that firm figures are calculable. Nor did they show how taking into account additional revenue beyond the first year would affect the Commission's conclusion that only negligible revenue-shifting could take place. In short, beyond maintaining that the ICC was wrong to use only one year's projected revenues, petitioners have not explained why this was error or how it mattered.
 
 
 20
 Petitioners further argue that the Commission erred in assuming that one-third of additional revenues attributable to the rail portion of joint movements could be shifted to the motor portion. See supra note 9. They ridicule the one-third figure as a percentage drawn out of thin air. Petitioners' Brief at 65-66. But petitioners are scarcely in a position to take issue with this figure, since they themselves first employed it in their calculations of Norfolk's ability to shift revenues. See Commission Decision at 32, J.A. at 34; see also Verified Statement of Barry C. Harris at 32 & Table 7, J.A. at 605, 645-46; Reply Verified Statement of Richard J. Barber at 5, J.A. at 710, 716. In any event, they make no effort to suggest why another proportion would be more appropriate.[10]
 
 
 21
 Like their attack on the Commission's analysis of revenue shifting, petitioners' challenge to the Commission's assessment that cost shifting was unlikely to occur is unfocused. Petitioners express doubt that accounting requirements and stand-alone cost guidelines will prevent the abuse that these regulations were formulated to prevent. They provide no basis for their fears, however; their concerns are simply too speculative to form a basis for overturning the agency's decision.
 
 III
 
 22
 Having reviewed the remaining challenge to the Commission's decision to approve the NS/NAVL acquisition, we are persuaded that the ICC acted lawfully and within its discretion. The petitions for rehearing are granted. For the reasons stated, the petitions for review are denied.
 
 
 23
 It is so ordered.
 
 
 
 [1]
 Petitioners are International Brotherhood of Teamsters, Regular Common Carrier Conference, and Patrick Simmons
 
 
 [2]
 As we more fully explained in our earlier opinion, this distinction is more than semantic. See Teamsters v. ICC, 801 F.2d at 1424-26. Interpreting the pertinent statutory phrase to mean "in its rail operations" in general requires the rail carrier to employ motor carrier operations only as an adjunct to rail movements. On the other hand, treating the phrase as meaning "in its overall operations" places little restriction on the extent to which motor carrier operations following consolidation may be carried on independently of rail operations. See id. at 1425. This interpretive distinction figured especially prominently in the NS/NAVL proposal because evidence suggested that NAVL would not merely be "auxiliary to or supplemental of" NS's rail operations, and thus the applicants, NS and NAVL, would likely have difficulty obtaining approval under the more restrictive approach. Id. at 1424
 
 
 [3]
 This legislation, which was signed into law October 27, 1986, took the form of a rider to the Anti-Drug Abuse Act of 1986, Sec. 3403, Pub.L. No. 99-570, and provides as follows:
 In any proceeding under section 11344 of title 49, United States Code, involving an application by a rail carrier (or a person controlled by or affiliated with a rail carrier) to acquire a motor carrier, the Interstate Commerce Commission, and any Federal court reviewing action of the Commission, shall follow the standards set forth in the Commission decision in Ex Parte No. 438 if the applicant rail carrier, between July 20, 1984, and September 30, 1986 (1) filed an application with the Commission to acquire a motor carrier, (2) entered into a contract or signed a letter of intent to acquire a motor carrier, or (3) made a public tender offer to acquire a motor carrier.
 49 U.S.C.A. Sec. 11344 Note, at 521 (1987). Thus, the Commission's interpretation of the "in its operations" phrase is legislatively ratified as to transactions for which applications were filed, contracts were entered, or tender offers were made between July 20, 1984, the date on which Ex Parte No. 438 was released, and September 30, 1986, the date on which our opinion issued. It would appear, in view of the narrow scope of this enactment, that Congress did not intend through this legislation to affect how courts or the Commission interpret the second prong of the three-part test of Sec. 11344(c) in analyzing transactions other than those specifically covered. We need not decide this issue, however, for petitioners concede that this most recent legislation applies in the case before us. See Petitioners' Response to Respondents' Petitions for Rehearing at 3 (Dec. 23, 1986).
 
 
 [4]
 Considering this persistence of a significant controversy between the parties, we are convinced that vacatur of our prior opinion would be unwise. See Crowell v. Mader, 444 U.S. 505, 100 S.Ct. 992, 62 L.Ed.2d 701 (1980) (vacatur inappropriate when only part of controversy mooted); cf. Alejandrino v. Quezon, 271 U.S. 528, 46 S.Ct. 600, 70 L.Ed. 1071 (1926) (vacatur appropriate where only incidental issues of relief remain, and record insufficient to permit their resolution). See generally United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950)
 
 
 [5]
 The Commission determined that the NS/NAVL acquisition would not have anticompetitive horizontal effects. It concluded that "NS/NAVL face pervasive intra- and intermodal competition and that the horizontal effects [of the acquisition] are so minimal and the competition so great that consolidation will not provide [NS/NAVL] with increased market power to suppress competition in any region of the United States." Commission Decision at 28, J.A. at 30. The ICC then turned to possible vertical effects of the acquisition, and it is solely to this facet of the Commission's analysis that petitioners have trained their fire. Finally, the Commission concluded that the consolidation would produce no anticompetitive conglomerate effects because "NS's competitors ... have the capabilities to provide competitive responses to NS-NAVL's proposed operating plan." Commission Decision at 34-35, J.A. at 36-37
 
 
 [6]
 In the parlance of the transportation industry, the shipment of goods through use of both truck and rail is an example of "intermodal" transportation. One popular form of intermodal transportation is trailer-on-flatcar ("TOFC") service, in which "freight is shipped by truck trailers that, during part of the trip, are carried piggyback on railroad flatcars." Teamsters v. ICC, 801 F.2d at 1424 n. 1
 
 
 [7]
 "Market power" is "the ability of one or more firms profitably to maintain prices above competitive levels for a significant period of time." Commission Decision at 24, J.A. at 26; see also U.S. Dep't of Justice Merger Guidelines, 49 Fed.Reg. 26,823, 26,827 (1984) (same)
 
 
 [8]
 Furthermore, petitioners' determination of where Norfolk exercised market power was flawed, the Commission found, by inclusion of traffic in which Norfolk participated as a "bridge carrier." Bridge carriers transport freight from one carrier to another, and so are less likely to be able to contol routing of traffic than carriers that pick up freight at its origin (origin carriers) or that leave freight at its destination (destination carriers). Commission Decision at 29, J.A. at 31
 
 
 [9]
 Petitioners' expert, Mr. Harris, assumed in a hypothetical illustration that one-third of the revenues attributable to the rail portion (NS) was susceptible to improper shifting to the motor portion (NAVL). See Verified Statement of Barry C. Harris at 32 & Table 7, J.A. at 605, 645-46; Reply Verified Statement of Richard J. Barber at 5, J.A. at 710, 716; see also Commission Decision at 32, J.A. at 34
 
 
 [10]
 This failure is especially telling since petitioners' figure, along with their other calculations, was the subject of vigorous debate before the Commission. Yet petitioners never advanced in Commission proceedings an alternative proportion, nor explained why the one-third figure was inappropriate, in spite of their opportunity to do so. See Opening Brief of Applicants to the Commission, at 123 (Jan. 17, 1985), J.A. at 727, 861; Brief of U.S. Dep't of Transportation to the Commission, at 34 (Jan. 17, 1985), J.A. at 180; Reply Brief of Applicants to the Commission, at 28-29 (Jan. 31, 1985), J.A. at 886, 913-14. In light of this failure, petitioners' attempt on appeal to characterize one-third "only as an arbitrary fraction used ... to illustrate the manner in which integrated enterprises are able to shift revenues" rings hollow. See Petitioners' Reply Brief at 30